IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

─────────────────────────────────────

No.  91-1355

─────────────────────────────────────

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GARY EUGENE STRAACH,

Defendant-Appellant.

─────────────────────────────────────

Appeal from the United States District Court
for the Northern District of Texas

─────────────────────────────────────

(March 19, 1993)

Before POLITZ, Chief Judge, GOLDBERG, and JONES, Circuit Judges.

GOLDBERG, Circuit Judge:

Defendant Gary Eugene Straach is a licensed firearms dealer who owns and operates Shooting Sports, a gun shop in Dallas, Texas. After a lengthy "sting" operation carried out by the government, Straach was indicted and later convicted of knowingly selling firearms to nonresidents by way of "strawman transactions." A strawman transaction is one in which a resident of the state in which the firearms dealer's business is located acts as an intermediary or agent for a nonresident who wishes to purchase a gun. With few exceptions, such transactions are prohibited by the Gun Control Act of 1968, 18 U.S.C. § 921 et seq.[1] The government contends that not only was Straach aware

─────────────────

[1]    18 U.S.C. § 922(b)(3) provides:
"It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or

1

that he was selling firearms to Texas residents acting as agents for nonresidents, Straach was also aware that the nonresidents were drug dealers who would use the firearms to commit violent acts.

Straach was indicted and tried on five counts, each of which

_____

deliver --
(3) any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located, except that this paragraph (A) shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States), and (B) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes." Defendant does not contend that either of the exceptions contained in subparagraph (b)(3) applies to him.

18 U.S.C. § 924(a)(1) provides:
"Except as otherwise provided in paragraph (2) or (3) of this subsection, subsection (b), (c), or (f) of this section, or in section 929, whoever --
(A) knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief from disability under the provisions of this chapter;
(B) knowingly violates subsection (a)(4) (a)(6), (f), (k) or (q) of section 922;
(C) knowingly imports or brings into the United States or any possession thereof any firearm or ammunition in violation of section 922(l); or
(D) willfully violates any other provision of this chapter, shall be fined not more than $5,000, imprisoned not more than five years, or both."

2

charged that he acted as a principal and that he aided and abetted his employees Pischer and Hogue. Counts two through five pertained to the substantive offenses of willful sales of firearms to nonresidents; while count one pertained to conspiracy to sell firearms to nonresidents, with knowledge or a reasonable belief that the firearms would be used to commit drug-related violent crime.[2] A jury convicted Straach on counts two and five, and acquitted him on counts one, three and four. Straach was fined $100 and sentenced to one year in prison, to be followed by three years supervised release.

On appeal, defendant contends that the evidence was insufficient to support the jury's verdict on counts two and five; that the jury's verdict of acquittal on count three bars his conviction on count two; that the court erred in refusing to declare a mistrial due to jury misconduct; and that the court erred in instructing the jury to continue deliberations after the jury indicated that it had reached a verdict on counts two through five, but was unable to reach a verdict on count one. Straach seeks acquittal or a new trial. Our jurisdiction is predicated upon 28 U.S.C.§ 1291. Finding no error, we affirm the defendant's conviction.

FACTS

After several Jamaican drug traffickers were apprehended in

---

[2] Count one involved alleged violations of 18 U.S.C. §§ 371; 922(b)(3); 924(a)(1); 924(c)(2); 924(c)(3)(A); and 924(g). Counts two through five pertained to alleged violations of 18 U.S.C. §§ 922(b)(3) and 924(a)(1).

1987 and 1988 and found to possess guns purchased from Shooting Sports, the Bureau of Alcohol, Tobacco and Firearms of the United States Department of the Treasury ("BATF") began an undercover investigation of Straach. Prior to beginning their undercover investigation, representatives of various law enforcement agencies visited Straach at Shooting Sports, to ascertain that Straach understood what the law required of him and to ask Straach to report license plate numbers of vehicles owned by buyers about whom he was suspicious. These law enforcement officers claim they gave Straach a BATF circular which defined the term "strawman transaction" and stated that strawman transactions are illegal.

Straach was indicted in 1990 and tried on five counts involving conspiracy and willful sales of firearms to nonresidents by way of strawman transactions, in some cases with knowledge or reason to believe that the firearms would be used to commit violent acts in furtherance of the trade in illegal drugs. Straach pled "not guilty" to all counts.

At trial, evidence of the strawman sales listed in counts two through five was provided by audiotapes of the transactions. These transactions involved a nonresident undercover law enforcement officer (Albritton), accompanied by a Texas resident (Bishop) who filled out the necessary paperwork and displayed a Texas driver's license. Straach claims he was not present during crucial parts of the transactions that were taped, but the government presented witnesses who testified that Straach was

4

present during the transactions. Evidence of strawman transactions predating the undercover operation was presented by witnesses, including Straach's employees, Hogue and Pischer.[3]

The audiotapes and witnesses both demonstrated that nonresidents came to Shooting Sports with Texas residents in order to purchase firearms, and that in at least some instances the nonresidents openly discussed their domiciles while in the shop. Although the Texas residents showed their drivers' licenses and filled out the necessary paperwork, the nonresidents selected the guns to be purchased, asked all or most of the questions about the guns, and negotiated prices.

Straach made his customers complete BATF Form 4473 ("Firearms Transaction Record"), which Straach usually filed with BATF as required. Form 4473 contains the following caution to sellers and buyers alike:

> WARNING -- The sale or delivery of a firearm by a licensee to an eligible purchaser who is acting as an agent, intermediary or "straw purchaser" for someone whom the licensee knows or has reasonable cause to believe is ineligible to purchase a firearm directly, may result in a violation of the Federal firearm laws.[4]

On August 4, 1988, Albritton, a nonresident BATF agent entered Shooting Sports accompanied by Bishop, a resident law enforcement agent. Neither Albritton nor Bishop disclosed that

---

[3] Hogue testified as part of a plea agreement with the government.

[4] Persons generally ineligible to purchase firearms from licensed dealers include nonresidents, persons who have been adjudicated incompetent, and persons who have been convicted of certain crimes.

they were law enforcement agents. Bishop asked no questions and did not examine any of the firearms. Albritton asked Straach questions about the firearms available for purchase in the store, and after looking at several firearms, said he was interested in buying three guns. Straach told Hogue to continue handling the sale. Hogue asked Albritton for his driver's license, and Albritton indicated that Bishop would complete the necessary paperwork. Bishop completed Form 4473 and displayed his Texas driver's license. Straach told Bishop which part of Form 4473 he needed to sign. Albritton paid the bill and took the receipts. While in the store, Bishop asked Albritton to give him one of the three firearms just purchased. Albritton carried all three firearms out of the store. This transaction was audiotaped and formed the basis for count two of the indictment. Albritton then requested that eight more guns be put on hold for him until he returned the next day, and paid the required deposit.

On August 5, 1988, Albritton returned with Bishop and purchased eight guns. Straach was present in the store but was talking to someone else who was present in the store. Straach acknowledged Albritton and told him that Pischer had started the necessary paperwork for the sale. Pischer then handed Albritton Form 4473, which Bishop filled out for him. No one requested any identification, so none was offered by Bishop or Albritton. Albritton paid for the guns and carried them away. This transaction was audiotaped and formed the basis for count three. Later that same day, Albritton telephoned Straach and informed

Straach that he was returning to Oklahoma.

On November 2, 1988, Albritton and Bishop again entered the store and succeeded in purchasing fourteen guns. Prior to purchasing the guns, Albritton informed Straach that the guns he had previously purchased at Shooting Sports had sold well in Oklahoma. Albritton specifically informed Straach that Albritton only had an Oklahoma driver's license and asked whether he would need Bishop to complete the necessary paperwork. Straach responded that Albritton should give the purchase money to Bishop, who should complete the form. Bishop then completed Form 4473, and both Bishop and Straach signed it. Albritton and Bishop then left the store. Albritton returned later the same day and picked up the fourteen firearms. This transaction as audiotaped and formed the basis for count five.

After listening to all of the evidence described here, the jury retired. On the final day of the jury's deliberations, the jury notified the judge that it had reached agreement on counts two through five, but could not reach agreement on count one. The judge conferred with counsel for each of the parties. The government asked the judge to instruct the jury to continue deliberations. Defendant's counsel stated that defendant "would be willing to accept the jury verdict as it is." In a written exchange, the judge instructed the jury: "Members of the jury: Considering the length of the trial and the amount of the evidence to be considered, the Court requests that you continue your deliberations in an effort to reach a verdict on all

counts." The judge indicated to defendant's counsel that he considered it the jury's prerogative to reconsider the verdicts they had reached on counts two through five as they continued to deliberate.

The transcript of the judge's colloquy with the parties' lawyers, prior to sending the jury instructions to continue deliberations, demonstrates that the judge would have been disinclined to sentence Straach if he was found guilty only of conspiracy (count one). Instead, the judge indicated that he would "consider very carefully a motion for a new trial in the event the only convictions would be on count one."

When the jury finally finished deliberating, they found Straach guilty of counts two and five, and not guilty of counts one, three, and four. He was fined $100 and sentenced to one year in prison,[5] to be followed by three years supervised release.

The day the verdicts were rendered and recorded, two of the jurors went to the office of defendant's lawyer and signed affidavits stating: (1) they believed Straach to be innocent on all counts, and (2) while the jury deliberated they had repeatedly stated their belief that Straach was innocent. Neither juror had indicated any lack of agreement with the verdicts when polled by the judge.

Dannie Heil, one of the two jurors who completed affidavits,

---

[5] Straach received a one year sentence for each of counts two and five, to be served concurrently.

8

stated that prior to reading the court's note telling them to continue deliberating, the jury had decided Straach was <u>not guilty</u> on counts two through five. According to Heil, the judge's note influenced the jury to reconsider the decision they had reached on counts two through five. Had the judge directed the jury to render their verdicts on counts two through five at the time the jury told the judge they were at an impasse, the only crime of which Straach might have been convicted was that listed in count one (conspiracy), a crime for which the judge had indicated he was unwilling to sentence defendant if defendant was acquitted on all other charges. Heil's affidavit also stated that some of the jurors wanted to convict Straach because they considered his behavior to be legal, but morally wrong;[6] that on the first day of deliberations the jurors had agreed to "compromise and trade off a guilty verdict on [count] five for a not guilty on [count] one;" and that on the last day of deliberations, the jurors agreed to another compromise, involving a guilty verdict on counts two and five in exchange for a verdict of "not guilty" on count one.[7]

---

[6]    This may be related to the fact that Straach's employee, Hogue, testified that some of the sales made by Hogue and Pischer were "morally wrong because they felt the guns would be used in drug deals and to commit crime."

[7]  Heil's affidavit stated:
"We had lengthy discussions on that and it was finally decided that if we would go on two and five that we would drop one.  That is ultimately what we did.  To this time, and I said so at the time, I said, I do not feel that he is guilty on any five, I am compromising on two and five for one, but I still do not believe that Gary Straach is guilty, and I do not believe that

When defendant sought declaration of a mistrial, he was given permission by the court to contact the other jurors. Ultimately, however, the court denied defendant's motion for a mistrial. The court acknowledged that it appeared the jury had "compromised," but considered significant the absence of any evidence that "any juror relied on, or attempted to introduce, any extraneous material into the jury deliberation process." The judge noted that "when polled, each juror indicated that [the jury's] verdict had been unanimous." The court continued:

> [I]t is clear to the Court that, based on the facts as alleged by Straach, he is not entitled to a mistrial. There is no indication that the jury engaged in any unpermitted activity during its deliberative process. Further, given the facts of this case, it is clear that Straach' [sic] right to a unanimous verdict was not violated.

## DISCUSSION

---

> at this time, I never did and I never will. When I left the courtroom I began to feel strange and that I had done something that I'm not very proud of and I decided that I couldn't live with this. I came down here and looked up [defendant's counsel] and I said, I am going to see what I can do to undo what I have done because I did not feel right that I made concessions when I should not have made concessions and I should have stuck to my guns and I did not do it."

In a supplemental affidavit, Heil stated: "Some of the jurors wanted to find Gary Straach guilty because he had sold guns to people who were originally from Jamaica. These jurors did not care if the sales were legal or not. These same jurors (more or less) wanted to find Gary Straach guilty because he had done some morally wrong things. I also believe that Gary Straach was entrapped." (emphasis added)

10

I.   SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE CONVICTION ON COUNTS TWO AND FIVE

The jury found defendant guilty of counts two and five (willful sales of particular firearms to nonresidents). Defendant claims that there was not enough evidence on which the jury could conclude that he intentionally sold firearms to nonresidents.  More particularly, he claims he did not know that strawman transactions are illegal (or, what amounts to the same thing, that he did not know the transactions he engaged in <u>were</u> strawman transactions), and therefore he lacked the criminal intent required for a conviction.

An appellate court reviews the evidence if possible in a manner consistent with the verdict.  <u>Glasser v. United States</u>, 315 U.S. 60, 80 (1942) ("The verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it") (citations omitted); <u>United States v. Fortna</u>, 796 F.2d 724, 740 (5th Cir.) ("[W]e must examine all the evidence and reasonable inferences in the light most favorable to the government and determine whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt") (citations omitted), <u>cert. denied</u>, 479 U.S. 950 (1986);  <u>United States v. Bell</u>,  678 F.2d 547, 549 (5th Cir.) ("It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except guilt....A jury is free to choose among reasonable constructions of the evidence"), <u>aff'd</u>, 462 U.S. 356 (1983).  The appellate court's role does not

include weighing the evidence or assessing the credibility of witnesses. Bell, 678 F.2d at 549; United States v. Martin, 790 F.2d 1215, 1219 (5th Cir.), cert. denied, 479 U.S. 868 (1986); United States v. Varca, 896 F.2d 900, 905 (5th Cir. 1990), reh'g denied, 901 F.2d 1110 (5th Cir. 1990), cert. denied, 111 S.Ct. 209 (1990); United States v. Espinoza-Franco, 668 F.2d 848, 851 (5th Cir. 1982). If a rational trier of fact could have found the defendant guilty, beyond a reasonable doubt, of the essential elements of the offense, then the conviction must be upheld. Jackson v. Virginia, 443 U.S. 307 (1979) (habeas review of state court conviction). We conclude that there was sufficient evidence in the instant case on which a reasonable jury could have decided that defendant was guilty of the substantive offenses charged in counts two and five.

Witnesses testified that prior to the BATF sting operation, Straach had engaged in strawman transactions after having been informed that the buyers intended to send the guns to New York for use in drug-related crimes. The government introduced not only testimony of witnesses to certain strawman transactions, but tape recordings of several strawman transactions (including those forming the basis for counts two and five).

With respect to the strawman transaction comprising count two, Straach was present when a nonresident undercover agent asked for help in selecting firearms. Straach contends, however, that he was not the salesperson responsible for processing that particular sale, and that he was not present when the nonresident

12

paid for the guns and the resident undercover agent filled out the necessary paperwork.  However, the government contends that throughout the entire taped transaction, Straach was present, even though he was not the salesperson directly handling the sale.  The jury was, of course, entitled to determine for itself the credibility of the witnesses to the tape-recorded transaction, when considering whether Straach was in fact present during the entire transaction.

While the evidence supporting defendant's conviction on count two was adequate, the evidence supporting his conviction on count five was overwhelming.  The government introduced an audiotape of the transaction, in which a nonresident undercover agent accompanied by a resident purchased fourteen guns from Straach.  The nonresident told Straach that the guns he had previously purchased from Straach had sold well in Oklahoma.  The nonresident then told Straach that he only had an Oklahoma license, and asked whether his Texan friend should therefore complete the necessary paperwork.  Straach told the nonresident that he should give the purchase money to the resident, who should fill out the Form 4473.  The Texan and Straach joked that the Texan should receive a commission for the service he was providing the nonresident.  The form memorializing the sale listed Straach as the salesperson.  The nonresident returned later the same day, unaccompanied by the Texan, to pick up the guns.

Straach claims he was lulled by representatives of BATF and

13

other law enforcement agencies into thinking that he was not breaking the law. He claims that he believed the transactions he carried out assisted BATF, insofar as he sometimes gave BATF the license plate numbers of vehicles owned by buyers. In 1986, two years prior to the transactions upon which counts two and five are based, a BATF officer named Ray told Straach, "As long as they're legal sales, go ahead and sell all the guns you want to the Jamaicans." Straach contends that Ray's statement further reinforced his belief that if a Texas resident accompanied a nonresident who wanted a gun, filled out the required paperwork and handed over the money, the transaction was legal. However, the government points out that Ray specifically stated that all sales of firearms must be legal. A reasonable interpretation of Ray's statement therefore is that sales to "Jamaicans" would be acceptable if the sales could be fit into one of the exceptions to the Gun Control Act permitting sales to nonresidents, or if the buyers were of Jamaican origin but were currently Texas residents. In any case, in April 1988, three months prior to the sting operation, a BATF officer visited Straach's store and gave Straach a circular prepared by BATF, explaining straw man transactions in detail and warning that they are illegal.

Although one of the jurors stated in an affidavit that he believed Straach was entrapped by BATF, there is little evidence that BATF inculcated in Straach the disposition to engage in strawman transactions. In fact, evidence was presented to show that Straach engaged in strawman transactions prior to

14

being contacted by BATF representatives.[8]  The defense of entrapment is unavailing if there is evidence that the defendant was predisposed to commit the crime.  See Hampton v. United States, 425 U.S. 484, 488-89 (1976); United States v. Russell, 411 U.S. 423, 436 (1973).  See also Sherman v. United States, 356 U.S. 369, 373-76 (1958).

Straach said something on the tape of the strawman transaction comprising count five which suggests Straach might not have understood what a strawman transaction was, or that what he was doing was illegal:  Straach told Albritton that Albritton needed to give the money to Bishop so that Bishop could pay Hogue and "avoid a strawman sale." Prior to the sting operation, Straach was also reported to have told an employee, "We must educate the Jamaicans on how to buy the guns legally." (emphasis added).

Nevertheless, Straach had every reason to know what a strawman transaction was, that this was just such a transaction, and that it was illegal.  Straach required buyers to complete BATF Form 4473, which listed the definition of a "strawman transaction" and warned that such transactions are generally illegal.  BATF officers testified that over the years, they had informed Straach that merely requiring a resident purchaser to use his own money and identification, and to fill out the paperwork himself, was insufficient to assure compliance with the

---

[8]     Witnesses testified that they had observed Straach selling firearms to persons who informed Straach that the guns would be shipped immediately to New York.

15

law against strawman transactions.  Specifically, Straach was informed that knowledge or a reasonable suspicion that a gun was being purchased by a resident for an ineligible buyer (such as a nonresident, an adjudicated incompetent, or a convicted felon), made the transaction an illegal strawman transaction.

Finally, defendant's attempt to  demonstrate a general lack of criminal intent by pointing to evidence that he did on occasion turn away strawman purchasers belies his claim that he did not understand such transactions to be illegal.  The jury was entitled to assess the credibility of the witnesses and to disbelieve Straach's feigned innocence of the illegality of strawman transactions.

The facts of this case are similar to those of United States v. Brooks, 611 F.2d 614, 616 (5th Cir. 1980),  in which this court upheld a conviction under 18 U.S.C. § 922(b)(3) for the sale of firearms by a licensed Florida dealer to a nonresident.[9] In Brooks, a nonresident attempted to buy a gun, but was told that to do so he would have to return with someone who was a Florida resident.  When the nonresident returned with a Florida resident, the resident filled out the necessary forms and tendered the amount due.  The resident did not "shop" for any guns in the store:  he asked no questions of the dealer, handled none of the guns, and did not attempt to negotiate the price.

---

[9]    Although Brooks did not involve a question as to the sufficiency of the evidence, the case is otherwise on all fours with the instant case.   Brooks was reversed on grounds not bearing upon the instant case.  See United States v. Henry,  749 F.2d 203, 206 (5th Cir. 1984).

16

The defendant admitted he sold firearms to a resident of Florida who bought the firearms for a nonresident, but claimed he thought the sale was permissible. This court upheld the defendant's conviction, saying:

> [T]he statute is violated by a sham sale made to a resident when the transaction is really with a nonresident, and it is for the jury to decide, on all the relevant evidence and with proper instructions, whether such a charade occurred or whether there was a bona fide sale to a resident.

611 F.2d at 619. In the instant case, Straach sold the firearms listed in counts two and five to a resident of Texas who was accompanied by a nonresident. The nonresident did the shopping, asking all the questions, selecting the guns he wanted, and supplying the purchase money.[10] As in Brooks, the resident simply filled out the necessary paperwork and displayed his own driver's license.

## II. WHETHER A VERDICT OF ACQUITTAL ON COUNT THREE BARS DEFENDANT'S CONVICTION ON COUNT TWO

Defendant contends that the not guilty verdict on count three bars defendant's conviction on count two, because each count pertains to the offense of willful sale of firearms to a nonresident. In other words, defendant argues that a verdict of acquittal on count three means the jury considered him to lack the requisite criminal intent for the offense charged in either

---

[10] Straach's brief contends that the undercover agents posing as a nonresident and a resident conferred with one another about the selection of the guns that were ultimately purchased on August 4 and 5, 1988. (These transactions formed the basis of counts two and three respectively.) He does not, however, contend that the undercover agent posing as a resident talked to Straach about the guns.

17

of counts two or three. We disagree with defendant's assessment of the import of the verdict of acquittal on count three. It is entirely possible that the jury found that defendant knowingly participated in a "sham transaction" with respect to the sale of the three firearms listed in count two, while he did not participate in selling to a nonresident the eight firearms with the serial numbers listed in count three. Counts two and three refer to transactions involving different batches of guns sold to the same nonresident buyer on two different days.

However, even if the two counts were related factually, a not guilty verdict on count three would not necessarily bar a guilty verdict on count two. In United States v. Fesler, 781 F.2d 384, 390 (5th Cir. 1986), reh'g denied, 783 F.2d 1063 (5th Cir. 1986), cert. denied, 476 U.S. 1118 (1986), the defendant argued that his acquittal on a conspiracy count involving child abuse collaterally estopped his conviction by the same jury for aiding and abetting child abuse. This court responded: "Collateral estoppel does not apply to the inconsistency of a verdict returned in a single trial. Rather, the doctrine applies in situations where the verdict of one jury precludes a subsequent jury from returning a verdict inconsistent with the earlier verdict." See also Harris v. Rivera, 454 U.S. 339, 346 (1981) (finding it well established that a jury has "unreviewable power...to return a verdict of not guilty for impermissible reasons"); United States v. Powell, 469 U.S. 57, 63-67 (1984). In United States v. Morris, 974 F.2d 587 (5th Cir. 1992), this

18

court considered whether a defendant's acquittal on charges involving one drug sale barred his conviction on charges related to a second drug sale. Defendant's only defense was that he was entrapped, and he argued that an acquittal on the first count would necessarily entail an acquittal on the second count (involving a drug sale occurring later in time). Defendant argued that in acquitting him on the first count, the jury must have found that defendant had no criminal predisposition until the government inculcated the criminal intent within him. In rejecting this argument, this court joined the Second and Ninth Circuits. See United States v. Smith, 802 F.2d 1119, 1125 (9th Cir. 1986) ("An initial entrapment does not immunize a defendant from criminal liability for subsequent transactions that he readily and willingly undertook"); United States v. North, 746 F.2d 627, 630 (9th Cir.), cert. denied, 470 U.S. 1058 (1985); United States v. Khubani, 791 F.2d 260, 264 (2d Cir.), cert. denied, 479 U.S. 851 (1986).

Finally, we note that even if the verdicts were inconsistent, that alone would not be grounds for reversal. In Powell, the Supreme Court reaffirmed that portion of Dunn v. United States[11] which did not apply to the doctrine of res judicata. In so doing, the Court stated:

> [W]here truly inconsistent verdicts have been reached, the most that can be said...is that the verdict shows that either in the acquittal or in the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of

---

[11]    284 U.S. 390 (1932).

19

> defendant's guilt....The fact that the inconsistency
> may be the result of lenity, coupled with the
> Government's inability to invoke review, suggests that
> incompatible verdicts should not be reviewable.

469 U.S. at 64, 66.  See also  Morris, 974 F.2d at 588.  An acquittal does not necessarily equate with a finding that the defendant was innocent.  The not guilty verdict may be the result of compromise, confusion, leniency, and so forth.  See, e.g., Dunn v. United States, 284 U.S. 390, 393-94 (1932).  See also Powell, 469 U.S. at 65-69.  Just as none of these factors can be raised by a juror attempting to overturn a guilty verdict, none can be used to argue that an acquittal on one count requires reversal of a guilty verdict on another count.

## III. WHETHER THE DISTRICT COURT ERRED IN REFUSING TO DECLARE A MISTRIAL

After reviewing defendant's motion for a mistrial (with affidavits from Heil and Steger), the court permitted defendant to contact the other jurors and file a supplemental motion for a mistrial. In the Order Denying Defendants' Motions for Mistrial, the court stated:

> Evidence that the jury may have compromised its vote,
> and the internal deliberative process of each juror,
> are insufficient grounds for a mistrial absent a
> showing that the jury relied on external forces in
> reaching their verdict....None of [Straach's] evidence
> suggests that any outside influence was brought to bear
> on the juror deliberations in this case.  As such, the
> Court is unable to conclude that the verdict reached in
> this case was improper.

The court relied heavily on the text of Fed. R. Evid. 606(b), which provides that:

> Upon an inquiry into the validity of a verdict or
> indictment, a juror may not testify as to any matter or

20

statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon  any juror.  Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

The court also considered whether the affidavits of Steger and Heil established that Straach had been denied the right to a unanimous verdict,[12] insofar as these two jurors claimed they had always maintained Straach's innocence during the jury's deliberations.  The court rejected this argument, because "at the time the verdict was rendered, each juror indicated that he or she had agreed to the verdict."

While a juror may attack the verdict (justifying a new trial) by testifying concerning <u>outside</u> influences on the jury, (e.g., newspapers, statements by court personnel), <u>see, e.g.</u>, <u>Mattox v. United States</u>, 146 U.S. 140 (1892); <u>Parker v. Gladden</u>, 385 U.S. 363 (1966), his testimony about the jury's internal deliberations cannot result in a mistrial.  Even a compromise verdict cannot be challenged later by a juror if a reasonable jury could have found that the conviction was supported by the evidence beyond a reasonable doubt.  <u>United States v. Dotterweich</u>, 320 U.S. 277, 278-79 (1943); <u>United States v.</u>

---

[12]    Fed.R.Crim.P. 31.

21

Gordon, 780 F.2d 1165, 1176 (5th Cir. 1986). Although testimony by jurors about "objective jury misconduct" is admissible in some jurisdictions, it generally is not admissible in the federal courts. See Notes following Fed.R.Evid. 606(b). See also Tanner v. United States, 483 U.S. 107, 117 (1987). Although two jurors came forward after the verdicts had been returned and recorded, stating that they had maintained throughout the jury's deliberations that defendant was not guilty on all counts, but had been pressured into compromising their verdicts on counts two and five, this "pressure" cannot count as an outside influence. See, e.g., United States v. Vincent, 648 F.2d 1046, 1049-50 (5th Cir. 1981) (juror's claim that he felt pressured to agree with other jurors due to the judge's charge that the jury do its best to reach agreement did not amount to "outside influence" brought to bear on juror).

Defendant also claims that jurors considered the penalties that might be visited upon Straach if they found him guilty on various counts. However, there is no evidence that they learned about these penalties from outside sources and therefore the verdicts must stand. See United States v. Lamp, 779 F.2d 1088, 1097 (5th Cir.), cert. denied, 476 U.S. 1114 (1986). Finally, a jury verdict cannot be challenged as nonunanimous if the jurors agreed to the verdict when polled, unless some competent evidence is presented which does not involve delving into the jurors actual deliberations. See, e.g., United States v. Gipson, 553 F.2d 453, 457 (5th Cir. 1977) (judge's instruction to jury

22

violated defendant's right to a unanimous verdict), <u>disapproved on other grounds</u>, <u>Schad v. Arizona</u>, 111 S.Ct. 2491, 2498-99 (1991).

Considering the highly deferential standard that applies to a trial judge's decision to deny or grant a mistrial, and defendant's failure to allege or demonstrate that outside influences were brought to bear on the jury, affirmance of the trial court's denial of defendant's motions for a mistrial is appropriate. <u>See e.g.</u>, <u>United States v. Sedigh</u>, 658 F.2d 1010, 1014 (5th Cir. 1981 Unit A), <u>cert. denied</u>, 455 U.S. 921 (1982); <u>United States v. Webster</u>, 960 F.2d 1301, 1305 (5th Cir. 1992), <u>cert. denied</u> <u>Nelson v. United States</u>, 113 S. Ct. 355 (1992) (each case applies abuse of discretion standard of review).

IV.   WHETHER THE DISTRICT COURT ERRED IN INSTRUCTING THE JURY TO CONTINUE DELIBERATIONS

After spending a great deal of time deliberating, the jury notified the court that it had reached verdicts on counts two through five, but was unable to each a verdict on count one.  The court instructed the jury to continue deliberating, without limiting the instruction to count one as requested by defendant's counsel.  Defendant contends this was error. The government contends that the court's instruction to the jury to continue to deliberate was "not prejudicial or coercive." Juror Heil's affidavit suggests that after the jury received the court's instruction to continue deliberating, they not only reached a not guilty verdict on count one, but changed their verdicts on counts two and five from not guilty to guilty. In one sense, then,

23

defendant <u>was</u> "prejudiced" by the judge's instruction to the jury.  However, there was no reversible error.

A judge may encourage jurors who are having difficulty reaching a verdict to deliberate longer, and to give due consideration and respect to the views of their peers.  <u>Allen v. United States</u>, 164 U.S. 492 (1896). <u>See also</u> <u>United States v. Bailey</u>, 480 F.2d 518 (5th Cir. 1973) (affirming en banc <u>United States v. Bailey</u>, 468 F.2d 652 (5th Cir. 1972)).  However, a judge errs in instructing the jury to deliberate further if the jury has reached a <u>final</u> verdict, which has been announced and recorded, <u>United States v. Taylor</u>, 507 F.2d 166, 168 (5th Cir. 1975), or when the instruction "unduly coerce[s] the minority into surrendering its views for the purpose of rendering a verdict, or set[s] a time limit for the deliberations," <u>United States v. Cheramie</u>, 520 F.2d 325, 329-31 (5th Cir. 1975).  <u>See also</u> <u>United States v. Lindell</u>, 881 F.2d 1313, 1321 (5th Cir. 1989), <u>cert. denied</u>, 493 U.S. 1087 (1990).

In this case, there is no suggestion that the jury's verdict on counts two through five was "final" when the judge instructed the jury to continue deliberating.  In <u>Taylor</u>, this court stated that:

> [A] jury has not reached a valid verdict until
> deliberations are over, the result is announced in open
> court, and no dissent by a juror is registered.  Even
> at this point, where the verdict is announced in open
> court and no dissent is voiced, the verdict may not be
> accepted by the court if a poll <u>taken before the</u>
> <u>verdict is recorded</u> indicates a lack of
> unanimity....Votes taken in the jury room prior to
> being returned in court are preliminary....This applies
> particularly where more than one count has been

24

> submitted to the jury, for continuing deliberations may
> shake views expressed on counts previously considered.
> Jurors are not bound by votes in the jury room and
> remain free to register dissent even after the verdict
> has been announced, though before the verdict is
> recorded. (citations omitted and emphasis added)

507 F.2d at 168. See also United States v. White, 972 F.2d 590, 595 (5th Cir. 1992), reh'g denied, 977 F.2d 576 (5th Cir. 1992), petition for cert. filed (Jan. 6, 1993).

Considering the standard of review that applies (abuse of discretion),[13] we cannot say that the district court erred in encouraging the jury to deliberate further. The note to the jury simply said, "Members of the jury: Considering the length of the trial and the amount of the evidence to be considered, the Court requests that you continue your deliberations in an effort to reach a verdict on all counts." The note did not coerce the minority jury members into agreement with the majority, or set a time limit on deliberations. The note expressed no opinion as to what kind of verdict the court preferred, or whether the verdicts on counts two through five should be revisited. Of course, the phrase "considering the length of the trial and the amount of the evidence to be considered" might have been read by a juror to mean that the result should be obvious to all jurors upon due consideration of the evidence. However, it remains difficult to construe the note as coercive or as favoring a particular verdict, insofar as it simply urged that "an effort" be made to reach a unanimous verdict. Thus, even if the note's

---

[13]    See, e.g., Lindell, 881 F.2d at 1320-21.

25

language deviated in some respects from that of previously approved <u>Allen</u> charges, it was acceptable.  <u>See</u> <u>Lindell</u>, 881 F.2d at 1320-21.  <u>Allen</u>'s age-old wisdom was intelligently applied in this case.

CONCLUSION

For the foregoing reasons, defendant's conviction is AFFIRMED.