IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 92-1260

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROBERT LYNN CASEL, a/k/a "POLO",
BENNIE JAY JACKSON,
GLORIA REED, a/k/a LULA MAE REED,
HERBERT D. JOHNSON, JR., and
SHARON WILLIAMS,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Texas

_____

(July 13, 1993)

Before GOLDBERG, GARWOOD, and WIENER, Circuit Judges.

GOLDBERG, Circuit Judge:

This appeal arises in the aftermath of a month-long trial involving eight defendants charged with twenty-nine counts of drug-related offenses. Five of the eight defendants appeal their convictions, raising myriad issues. Although we have considered all of the contested issues, we find that only five merit discussion. Finding no error, we affirm the convictions and sentences of the appealing defendants. We dismiss appellants' claims of ineffective assistance of counsel, without prejudice to those claims later being raised in a habeas corpus proceeding.

FACTS

All five appellants were convicted of possession and

1

distribution of cocaine. Only Reed and Williams were convicted of conspiracy. Williams allegedly was the supplier of the cocaine, selling it to Reed who, with the help of the other appellants, resold it. The government presented documentary evidence and nine witnesses to support its case against appellants. The government relied most heavily on the testimony of a man named Sammy Scott, Jr. ("Scott"), a member of the drug ring who received a lenient plea agreement in exchange for his testimony. Scott's testimony was internally inconsistent and, it now appears, inaccurate in certain respects, though not necessarily mendacious. Scott's testimony was the sole evidence used to convict Casel on count twenty-eight (distribution of cocaine), and Reed on count four (sale of cocaine to a minor). We will address the facts pertaining to each individual appellant in turn, beginning with appellant Williams.

Scott testified that Williams was one of the primary suppliers of the drug ring, selling Reed between one-quarter kilogram and two kilograms of the drug on four occasions. Scott testified that on one or two occasions, he did not actually see Williams in possession of the cocaine Reed allegedly obtained from Williams. However, Scott testified that on other occasions (including one occasion when two kilograms were obtained by Reed), Williams made a point of showing Scott the cocaine. Scott also testified that Williams was aware of the drug ring's operations.

Scott testified that during his involvement with Reed, the

leader of the drug ring, he bought cocaine from Reed, saw Reed cooking and refining cocaine, helped Reed sell cocaine to adults and to at least one minor, shared the profits from their cocaine sales, and traveled with Reed to destinations at which Reed obtained cocaine from suppliers like Williams.

Scott testified that Reed went to California to buy a kilogram of cocaine for defendant Johnson, and that when she returned she announced her intention to sell it to Johnson. Later she gave Scott $2,000 as his share of the sale. This transaction formed the basis for count seven. Scott's mother corroborated Scott's testimony that when Reed arrived back in Amarillo from her trip to California, Reed stated she had a kilogram of cocaine in her girdle. The government also introduced documentary evidence showing that Reed had made a trip to California on or around the date which Scott and his mother claimed she had. There was additional evidence that Reed had participated in a "controlled buy."

Scott testified that he was present when Reed and Johnson negotiated the sale of five ounces of cocaine to a minor. Scott watched Reed, Johnson and the minor go to Johnson's home. When Reed returned, Reed told Scott she had just taken care of some business and gave him $2,500, which he presumed was his share of the sale. This sale formed the basis of count four of the indictment.

The government introduced documentary evidence establishing that telephone calls were made to Scott's mother and to appellant

3

Williams from pay phones near the hotel at which Scott claimed that he and Reed stayed during one of their trips to Houston to buy drugs from Williams. Scott's mother corroborated his testimony when she stated that she had personal knowledge of the fact that her son and Reed were involved in drug dealing. Other witnesses testified that Reed had sold cocaine to them or to people they knew. Still others testified that Reed had borrowed money from them in order to purchase cocaine from her sources.

Scott agreed to cooperate with the government prior to the time at which Reed was indicted. During this period, some of Scott's conversations with Reed were audiotaped, including some in which Reed discussed the drug ring's operations and her ability to recognize cocaine of various qualities. These audiotapes were later played for the jury.

Scott also testified against Johnson. As noted above, Scott testified that Johnson assisted Reed in the sale of cocaine to a minor, and on at least one occasion delivered cocaine to Scott's mother's store. The government introduced evidence of many purchases and sales of cocaine by Johnson during the period 1986-90,[1] evidence of Johnson's state court conviction for possession of cocaine in 1987, and cocaine seized from Johnson's home with a search warrant.

Several witnesses testified to Jackson's role in buying and

---

[1] Three witnesses, Gilbert Salinas, Homer Perkins and Mrs. Scott (Sammy Scott, Jr.'s mother) testified that they had all bought cocaine from Johnson during the period 1986-90.

selling drugs for the drug ring. Evidence was produced to show that Jackson had sold cocaine to an undercover government agent. A witness named Teresa Watts testified that she sold cocaine for Jackson. Watts claimed that Jackson tried to cajole (if not coerce) her into testifying that she did not sell drugs for him. While she admitted Jackson did not harm her or explicitly threaten her physically, she testified that he doggedly pursued her to various places she frequented in order to encourage her to lie to the police.

Scott claimed that Casel sold cocaine to a group of five people in January, 1991. Then he changed his story and said the date of the sale was January, 1990. Scott named the five alleged buyers; when two of the alleged buyers were called as defense witnesses, they denied purchasing cocaine from Casel. The other three alleged buyers were not called as witnesses by either the government or the defense. It was later discovered that one of these alleged buyers had been incarcerated at the time of the alleged sale. Additional testimony regarding Casel's involvement in the drug ring included two witnesses' testimony that they had purchased cocaine from Casel on numerous occasions, and Mrs. Scott's testimony that one of the cocaine orders she placed with Johnson was actually filled by Casel, who brought the cocaine to the liquor store operated by Mrs. Scott.

After a month-long jury trial, Casel was acquitted of one count of conspiracy, but was found guilty of one count of distribution of cocaine. Johnson was acquitted on one count of

5

conspiracy, and found guilty on two counts of possession of cocaine with intent to distribute, two counts of distribution of cocaine (including one count for distribution of cocaine to a minor), one count of continuing criminal enterprise (drug trafficking), and five counts of money laundering.  Jackson was acquitted on one count of conspiracy and one count of using a firearm during a drug trafficking crime, but was found guilty of three counts involving distribution of cocaine, one count of continuing criminal enterprise (drug trafficking), and one count involving obstruction of justice.  Reed was acquitted on one count of distribution of cocaine and another count of possession of cocaine with intent to distribute, but was found guilty of one count of conspiracy to distribute and conspiracy to possess cocaine with intent to distribute, one count of distribution of cocaine to a minor, one count of distribution of cocaine (to an adult), and four counts of distribution and possession of cocaine with intent to distribute.  Williams was convicted on one count of conspiracy and two counts of distribution and possession with intent to distribute cocaine.

ANALYSIS

1.    Whether the evidence was sufficient to support the convictions of Casel, Reed, Williams and Jackson?

An appellate court reviews the evidence if possible in a manner consistent with the verdict. Glasser v. United States, 315 U.S. 60, 80 (1942) ("The verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it") (citations omitted); United

6

States v. Fortna, 796 F.2d 724, 740 (5th Cir.) ("[W]e must examine all the evidence and reasonable inferences in the light most favorable to the government and determine whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt") (citations omitted), cert. denied, 479 U.S. 950 (1986); United States v. Bell, 678 F.2d 547, 549 (5th Cir.) ("It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except guilt....A jury is free to choose among reasonable constructions of the evidence"), aff'd, 462 U.S. 356 (1983). The appellate court's role does not extend to weighing the evidence or assessing the credibility of witnesses.  Bell, 678 F.2d at 549; United States v. Martin, 790 F.2d 1215, 1219 (5th Cir.), cert. denied, 479 U.S. 868 (1986); United States v. Varca, 896 F.2d 900, 905 (5th Cir.), cert. denied, 498 U.S. 878 (1990); United States v. Espinoza-Franco, 668 F.2d 848, 851 (5th Cir. 1982).  If a rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the essential elements of the offense, then the conviction must be upheld.  Jackson v. Virginia, 443 U.S. 307 (1979) (habeas review of state court conviction); United States v. Straach, 987 F.2d 232, 237 (5th Cir. 1993).  A review of the evidence against Casel, Reed, Williams and Jackson reveals that it was sufficient to support their convictions.[2]

---

[2]     Defendant Johnson does not contend that the evidence was insufficient to support his conviction.

7

CASEL:

Casel was convicted of selling cocaine (and of no other offense) solely on the basis of Scott's testimony. A conviction may be based solely on the uncorroborated testimony of an accomplice, as long as the testimony is not insubstantial on its face. See, e.g., United States v. Carrasco, 830 F.2d 41, 44 (5th Cir. 1987). However, Casel argues (along with his co-defendants) that Scott's testimony was not credible because he changed his story at least three times during the trial.[3] Although it appears that Scott's testimony was indeed inaccurate in certain respects, it was not so inaccurate or inconsistent as to make it incredible as a matter of law.

Scott testified that on January 3, 1990, he witnessed Casel selling cocaine to a group of five people, including one person who was incarcerated on that date. Casel's trial attorney did not object to the testimony or attempt to present evidence that the buyer was incarcerated on January 3, 1990, because he did not learn about that fact until after the trial was concluded (but before sentencing had taken place).

The indictment's language ("on or about January 3, 1990") saves the indictment from having to be perfectly specific about

---

[3]    In addition to Scott's clearly having been wrong about the presence of the incarcerated buyer during the drug deal, there is also the fact that Scott originally stated that the transaction took place in January, 1991 (not January 1990), and that Scott initially stated that Casel had sold cocaine to a group of two people, not a group of five people.

the date in question. See United States v. Hernandez, 962 F.2d 1152, 1157 (5th Cir. 1992). Furthermore, Scott's testimony is not "incredible" merely because he misremembered the exact date of the transaction, or the number and identity of the buyers. The jury could have found that Scott inaccurately remembered the identity of one of the five buyers, while believing Scott's testimony that the sale of cocaine to a group of people by Casel occurred. Alternatively, it is possible that the jury decided that Scott misremembered the exact date of the transaction (because he expressed some uncertainty about it), but correctly remembered the identity of all five purchasers. (The alleged buyer who was incarcerated on January 3, 1990, was a free man only a week before that date.[4]) The jury could have chosen to disbelieve the testimony of two of the alleged purchasers, who when called as witnesses for the defense claimed they had never purchased cocaine from Casel.

The test for "incredibility" of a witness is an extremely stringent one, because an appellate court does not weigh the credibility of witnesses. To be found "incredible" as a matter of law, the witness' testimony must be factually impossible. See United States v. Lindell, 881 F.2d 1313, 1322 (5th Cir. 1989) (Because the jury is "the ultimate arbiter of the credibility of a witness....Only when testimony is so unbelievable on its face that it defies physical laws should the court intervene and

_____

[4] The alleged buyer was incarcerated from December 28, 1989 until sometime in March, 1990.

9

declare it incredible as a matter of law"), cert. denied, 496 U.S. 926 (1990); United States v. Silva, 748 F.2d 262, 266 (5th Cir. 1984) ("[A] conviction may be based solely upon the uncorroborated testimony of an accomplice if the testimony is not incredible or otherwise insubstantial on its face") (citation omitted).  The mere fact that the witness' memory is later shown to be somewhat flawed will not suffice to demonstrate that the witness' entire testimony is "incredible."

In Lindell, this court was confronted with a claim that defendant's conviction for possession with intent to distribute marijuana was reversible because it was based upon the testimony of a witness who initially failed to mention the defendant's role in the crime and only did so after further questioning by the prosecutor.  The witness' implication of the defendant only after continued questioning by the prosecutor did not make the witness' testimony "unbelievable," 881 F.2d at 1322, for "[o]nly when testimony is so unbelievable on its face that it defies physical laws should the court intervene and declare it incredible as a matter of law." Id. (citing United States v. Carrasco, 830 F.2d 41, 44 (5th Cir. 1987); United States v. Palacios, 612 F.2d 972, 973 (5th Cir. 1980)).  See also United States v. Espinoza-Franco, 668 F.2d 848, 851 (5th Cir. 1982).  Under this standard, we are forced to conclude that Scott's testimony was sufficiently credible that a jury could choose to rely upon it.

REED:

Reed was convicted on one count of conspiracy, one count of

10

distribution of cocaine to a minor, and three counts of distribution and possession of cocaine with intent to distribute. The government's case against Reed for distributing cocaine to a minor was supported solely by Scott's testimony. Scott testified that he saw Johnson and Reed negotiate a sale to a minor, and that he saw all of them go to Johnson's house. When Reed returned, she allegedly said she had just taken care of some business and gave Scott $2,500, which Scott said he presumed was his share of the sale that had just occurred. As a co-defendant, Johnson could not be called to testify. The minor testified that he had never met Reed. Reed claims that Scott changed his testimony repeatedly and therefore was not a credible witness on whose testimony a reasonable jury could convict her. However, we conclude that a reasonable jury could have disbelieved the minor and credited Scott's testimony, which was not "so unbelievable on its face that it def[ied] physical laws." <u>Lindell</u>, 881 F.2d at 1322.

The evidence supporting Reed's convictions for possession with intent to distribute one kilogram of cocaine, and sale of one kilogram of cocaine, is also sufficient. Scott testified that Reed went to California to purchase a kilogram of cocaine for resale in Amarillo. When Reed returned, she came to the liquor store operated by Mrs. Scott (Sammy Scott's mother). Mrs. Scott testified that Reed said she had just returned from California with a kilogram of cocaine in her girdle. The government also introduced documentary evidence and testimony of additional

witnesses to support its contention that Reed was the leader of a drug ring, purchased cocaine and processed it for resale, and sold cocaine on many occasions.

WILLIAMS:

Williams was convicted of one count of conspiracy and two counts of distribution and possession with intent to distribute cocaine.  We find that there was sufficient evidence on which the jury could have based convictions on all three counts.

The evidence supporting Williams' conviction for distribution of cocaine includes Scott's testimony that he and Reed travelled to Houston on four separate occasions to purchase (from Williams) between one-quarter kilogram and two kilograms of cocaine.  Scott claims that Williams showed him the cocaine on two of these occasions; the other two times, Reed showed him the cocaine after meeting with Williams.  The government also introduced certain documentary evidence of the connection between Reed and Williams:  telephone records indicating calls from Reed to Williams on the dates, and from the locations, that Scott claimed the calls were made.

Williams claims that the evidence supporting the conviction for conspiracy is insufficient, because even if the evidence reveals that she sold cocaine to Reed, it does not show that she knew about or assisted in the business of the drug ring led by Reed.  The evidence presented by the government indicates otherwise.  Williams was Reed's primary supplier, repeatedly selling Reed quantities of cocaine so large that they could not

12

possibly have been intended for personal use.  While the amount of drugs bought or sold does not by itself suffice to establish participation in a conspiracy, see United States v. Baker, 905 F.2d 1100, 1106 (7th Cir.), cert. denied, 498 U.S. 876 (1990), evidence "that the defendant knew of the existence and scope of the conspiracy and sought to promote its success," is sufficient. Id.  Scott testified that Williams sold Reed large amounts of powder cocaine on four occasions (at least once on partial credit), and was aware of Reed's intention to process and sell it.

Williams contends that the only member of the drug ring with whom she was acquainted was Reed, and that therefore she simply had a buyer-seller relationship to Reed.  While "it takes two to conspire...the government doesn't have to prove with whom a defendant conspired; it need only prove that the defendant joined the agreement alleged; not the group."  United States v. Townsend, 924 F.2d 1385, 1389 (7th Cir. 1991).  See also United States v. Michelena-Orovio, 719 F.2d 738, 746 (5th Cir. 1983) (en banc) ("Conspiracies to distribute narcotics have generally been considered to be prime examples of chain, or interconnected, conspiracies, in which a participant in a segment of the conspiracy may be convicted of participating in the whole"), cert. denied, 465 U.S. 1104 (1984);  United States v. Martino, 664 F.2d 860, 876 (2d Cir. 1981), ("[I]n many narcotics distribution networks the ultimate retailers may not know the identities of those who supply their wholesaler, and the

13

retailers' identities may be unknown to those suppliers; but all are well aware that they are participating in a collective venture"), cert. denied, Miller v. United States, 458 U.S. 1110 (1982).

While it is true that "evidence of a buyer-seller relationship, standing alone, is insufficient to support a conspiracy conviction," Townsend, 924 F.2d at 1394, evidence indicating that both parties knew that the drug purchases were meant for resale is "sufficient to establish a distribution conspiracy between them," id. at 1415, especially when each party has a stake in the success of the other's business, suggesting "a substantial degree of cooperation and partnership rather than a series of isolated and sporadic transactions," id. at 1406.  It is especially significant that not only did each party know that "the other had a network of drug associates, but also...each was committed to maintaining their successful business relationship." Id. at 1406.  Williams was Reed's primary supplier.  On at least one occasion, Williams sold Reed cocaine on partial credit, with the understanding that Reed would make up the amount owing at a later date, possibly at the time of the next purchase. Presumably, therefore, Williams considered it to be in her own long-term interests to cooperate with Reed and to help Reed succeed in reselling the cocaine Williams supplied her.

There was evidence that Reed's distribution of powder and crack cocaine was reasonably foreseeable to Williams, that Williams agreed to further Reed's criminal enterprise, and in

14

fact assisted it.  See United States v. Elam, 678 F.2d 1234 (5th Cir. 1982); United States v. Devine, 934 F.2d 1325 (5th Cir. 1991), cert. denied, Barker v. United States, 112 S.Ct. 349 (1991).  The jury was entitled to credit Scott's testimony and the government's documentary evidence in convicting Williams on all three counts charged in the indictment.

JACKSON:

Defendant Jackson was convicted of obstructing justice in violation of 18 U.S.C. § 1503, based upon his having attempted to influence a witness using intimidation, threats and deception. He contends that his conviction under § 1503 was not supported by the evidence because no judicial proceeding had yet taken place at the time he attempted to influence the witness.  While it is true that § 1503 can only support a conviction for interference with a pending judicial proceeding, as opposed to a police or agency investigation,[5] at the time Jackson approached the witness and endeavored to intimidate her into lying for him, the superseding indictment had already been returned.  Since this clearly indicates that a judicial proceeding was "pending," Jackson's conviction under § 1503 was not legally or factually insufficient.

2.   Whether it was an abuse of discretion for the court to deny Casel's motion for a new trial based on newly discovered evidence?

---

[5]   See United States v. Brown, 688 F.2d 596 (9th Cir. 1982); United States v. Wood, 958 F.2d 963 (10th Cir. 1992).

15

An appellate court reviews the denial of a new trial based on the alleged existence of new evidence for abuse of discretion. United States v. Miliet, 804 F.2d 853, 859 (5th Cir. 1986). In Miliet, this court laid out five elements, each of which must be present to justify a finding that the trial court's ruling was "so clearly erroneous as to amount to an abuse of discretion":

> (1) the evidence must be discovered following trial, (2) the movant must show due diligence to discover the evidence, (3) the evidence must not be merely cumulative or impeaching, (4) the evidence must be material to the issues before the court, and (5) the evidence must be of such a nature that a new trial would probably produce a new result.

804 F.2d at 859 (citing United States v. Fowler, 735 F.2d 823, 830 (5th Cir. 1984)). Casel has not met this test.

Prior to sentencing, Casel's attorney submitted an affidavit to the court containing the "newly discovered evidence" that one of the five alleged buyers of cocaine had been incarcerated on the date Scott alleged the sale took place. Not only has Casel failed to establish "due diligence" in attempting to locate this "new" evidence, but he failed to show that a new trial would probably produce a new result. Moreover, because Casel had introduced the testimony of two of the five alleged buyers, and these two persons had denied purchasing cocaine from him, the new evidence would be "merely cumulative or impeaching" under Miliet.

3.   Whether Casel and Jackson were denied effective assistance of counsel?

Casel claims that his trial attorney gave him ineffective assistance by failing to investigate the whereabouts of the man who was incarcerated at the time that Casel is alleged to have

16

sold him cocaine, and as a result of being the law partner of the spouse of one of the prosecutors in this case. Jackson claims his counsel gave him ineffective assistance by failing to challenge the jury venire prior to voir dire (for alleged underrepresentation of Hispanics), and by failing to introduce the testimony of certain witnesses who allegedly might have impeached Scott. Jackson also claims he received ineffective assistance of counsel because his attorney failed to introduce character evidence at the sentencing phase.

None of these claimed deficiencies were brought to the attention of the district court prior to being argued on appeal. Generally, "a claim of ineffective assistance of counsel cannot be resolved on direct appeal unless it has been first raised before the district court." United States v. Bounds, 943 F.2d 541, 544 (5th Cir. 1991). Exceptions to this general rule are made "only when the record has provided substantial details about the attorney's conduct." Id. See also United States v. Blankenship, 923 F.2d 1110, 1118 (5th Cir. 1991), cert. denied, 111 S.Ct. 2262 (1991). We decline to consider the issue of ineffective assistance of counsel because we consider the record insufficient. We dismiss this portion of the appellants' appeals without prejudice to appellants' right to raise the issue of ineffective assistance of counsel in a habeas corpus proceeding. See Bounds, 943 F.2d at 543; United States v. Ugalde, 861 F.2d 802, 804 (5th Cir. 1988), cert. denied, 490 U.S. 1097 (1989); 28 U.S.C. § 2255 (1988).

17

4.   Whether the court erred in conducting a <u>James</u> hearing in the presence of the jury?

A <u>James</u> hearing is held to determine whether an out-of-court statement of an alleged co-conspirator should be admitted into evidence.  To admit an out-of-court statement of an alleged co-conspirator requires a showing of a conspiracy and of the connection of the declarant and the defendant with the conspiracy, as well as a showing that the statement was made during the course of the conspiracy and in furtherance of the conspiracy.  <u>United States v. James</u>, 590 F.2d 575 (5th Cir. 1979), <u>cert. denied</u>, 442 U.S. 917 (1979).  The government is correct in stating that there is no authority for appellant Casel's argument that such a hearing must be held outside the presence of the jury.  <u>See</u> <u>United States v. Fragoso</u>, 978 F.2d 896, 899 (5th Cir. 1992), <u>cert. denied</u>, 113 S.Ct. 1664 (1993).

5.   Whether various statements by the prosecutor were improper and so infected the proceedings that the appellants should be given a new trial?

Appellants argue that several comments by the prosecutor were improper and so infected the proceedings as to deprive the appellants of a fair trial.  Appellants objected to all but one of these comments when made.  Although at least one of prosecutor's comments was improper, we find that the error was harmless.[6]  Reversal based on improper argument by the prosecutor

_____

[6]     Even if a prosecutor's statement constitutes error, the error is harmless if examination of the entire record suggests that the defendant was not substantially prejudiced by the prosecutor's statement. <u>United States v. Morris</u>, 568 F.2d 396, 402 (5th Cir. 1978).

18

is not called for when there has not been a strong showing of a deleterious effect upon the right to a fair trial. See, e.g., United States v. Iredia, 866 F.2d 114, 117 (5th Cir. 1989), cert. denied, 492 U.S. 921 (1989); United States v. Lowenberg, 853 F.2d 295, 301 (5th Cir. 1988), cert. denied, 489 U.S. 1032 (1989); United States v. Diaz-Carreon, 915 F.2d 951, 956 (5th Cir. 1990); United States v. Young, 470 U.S. 1, 11 (1985).

If the defendant did not object to the prosecutor's comment when made, we review for plain error, that is, error which is "obvious, substantial, and so basic and prejudicial that the resulting trial lacks the fundamental elements of justice." United States v. Valdiosera-Godinez, 932 F.2d 1093, 1097 (5th Cir. 1991) (quoting United States v. Birdsell, 775 F.2d 645, 653 (5th Cir. 1985), cert. denied, 476 U.S. 1119 (1986)).  However, if the defendant did object to the prosecutor's comments when made, there are three factors for the appeals court to consider in deciding whether to reverse the defendant's conviction due to improper prosecutorial argument.   These factors are: (1) "the magnitude of the prejudicial effect" of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction. Diaz-Carreon, 915 F.2d at 956.  If the evidence to support a conviction is strong, then it is unlikely that the defendant was prejudiced by improper arguments of the prosecutor and reversal is not required.  Id. The magnitude of the prejudicial effect is tested in part by looking at the prosecutor's remarks in context,

and attempting to elucidate their intended effect.  See, e.g.,
United States v. Bright, 630 F.2d 804, 825 (5th Cir. 1980);
United States v. Forrest, 620 F.2d 446, 455 (5th Cir. 1980).
Having laid out the applicable legal standard, we now review the
allegedly improper prosecutorial arguments in turn.

First, appellant Johnson objected at trial that the
prosecutor implied that appellant Johnson had failed to introduce
evidence of his innocence; specifically, that the prosecutor
asked rhetorically "why credit card receipts had not been
produced, why was the method of payment for car repairs not
produced, and why testimony has not been given to support the
defendant's claim of innocence." In fact, the prosecutor was only
asking questions of a defense witness whose testimony was offered
to support a particular defense asserted by defendant.  The
prosecutor asked the witness, "Why can't we see the cancelled
check that [you] paid for [your] car repair with?  How about the
receipts, some credit card receipts?"[7] The record clearly shows
that the prosecutor was merely commenting on the paucity of
evidence for a particular defense that defendant Johnson sought
to advance.  Since the prosecutor's comments were intended as a
statement that the defense had failed to produce any evidence of
a defense he was advancing, rather than as a statement about the
silence of the defendant himself, then the comments cannot form

_____

[7]     Ms. Mathis said she had traveled to Houston with Reed,
and that no drugs were bought or sold on that trip.  She also
claimed that her car had required repair in Houston.

20

the basis for a reversal.  See Bright, 630 F.2d at 825; United States v. Ramirez, 963 F.2d 693, 700 (5th Cir.), cert. denied, Garcia v. United States, 113 S.Ct. 388 (1992); United States v. Jones, 648 F.2d 215, 218 (5th Cir. Unit B 1981).  In any case, Johnson did not show that he was prejudiced by the comments, and the evidence to support his conviction was strong.

Second, the appellants collectively object to the prosecutor's opening argument, in which she stated that conviction of the defendants was required to protect the jurors' community from drug dealers.  Because appellants did not object to this portion of the prosecutor's argument at trial, appellants now must establish that the court's allowance of the prosecutor's comments was plain error.  Valdiosera-Godinez, 932 F.2d at 1097; Diaz-Carreon, 915 F.2d at 957. The prosecutor introduced her statements about the drug problems in Amarillo with prefatory phrases such as "You will see...."; "The evidence will show...."; "You will hear"; and "You will learn." The prosecutor's statement that illicit drug sales were common in certain sections of Amarillo was later corroborated by witnesses for both the prosecution and the defense.  The government now argues that the prosecutor's opening remarks were nothing more than a "road map" to what she believed the evidence would show, while appellants contend the prosecutor's comments were calculated to prejudice the jury and "inflame their passions."  In United States v. Morris, 568 F.2d 396, 401 (5th Cir. 1978), this court made it clear that a prosecutor may state her own opinion or knowledge of

21

the case as long as she makes it clear that her conclusions are "the conclusions to be drawn from the evidence." In the instant case, the prosecutor presented evidence in support of her opening statements. In light of that crucial fact, we cannot say that the statements constitute plain error.

Third, in her closing argument, the prosecutor stated that she would not ask the jury to convict the defendants based solely on one witness' testimony, but that since she had presented nine witnesses against the defendants, she felt the jury "could feel pretty comfortable" about convicting the defendants. Appellants objected to this statement when made. The appellants claim that the prosecutor was suggesting to the jury that there was something legally crucial about the fact that the government had produced nine witnesses, and that the prosecutor herself found these witnesses credible. We have often said that a prosecutor "may not express his personal opinion as to the credibility of witnesses, or his own belief regarding a defendant's guilt." United States v. Walker, 613 F.2d 1349, 1355 (5th Cir.), cert. denied, 446 U.S. 944 (1980) Here, however, it is clear from the context in which the statement was made that the prosecutor was not expressing her personal opinion about the defendants' guilt, the credibility of individual witnesses or of the witnesses as a group. Instead, she was offering a generalized comment on the weight of the government's case against the defendants. In other words, she was simply saying that the case against the defendants was not thin. A prosecutor's assessment that the evidence for

22

her case is strong is similar to her vouching for her witnesses by noting the absence of any evidence suggesting they have any reason to lie. Each is permissible to the extent that it draws a conclusion based solely on the evidence presented. See United States v. Enstam, 622 F.2d 857, 869 (5th Cir. 1980), cert. denied, 450 U.S. 912 (1981) (it is acceptable to draw reasonable inferences from the evidence when arguing to the jury; provided prosecutor does only this, she is not injecting "personal opinions" into her argument); Bright, 630 F.2d at 824 (a prosecutor may respond to character assassination visited upon the government's witnesses, and may point to the lack of any reason to think a witness is lying; "[t]he prosecutor is not obliged to sit quietly while character assaults are made on his witnesses; he is entitled to argue fairly their credibility"); United States v. Binker, 795 F.2d 1218, 1223 (5th Cir. 1986) (prosecutor may respond to attacks on credibility of her witnesses), cert. denied, 479 U.S. 1085 (1987).

Fourth, in her closing argument, one of the prosecutors stated that while the government's star witnesses plea-bargained, they did not get sweet deals. She continued:

> I want you [the jury] to think about what these guys' lives are going to be like the rest of their life....Did you see James Dawkins [government witness] shaking up there when Seldon Hale [defense attorney] asked him, "What unit are you in, Mr. Dawkins?" Did you see him? He is scared....From now on, every Government witness in this case is going to have to watch his back....Do you remember Gilbert Salinas [government witness] telling us that Joe Cofer [defendant who is not appealing] told him, "It is not smart to be talking on people if you are going to the pen." And he told Gilbert Salinas that he could get

23

him hit in the pen. He can get him from here, clear down to the pen. And folks, it can be done. You notice when one of the defense lawyers was questioning, I don't know who they were questioning, but they wanted to know, "What bay is Johnny Miller [government witness] in? What bay is Gilbert Salinas in? What bay is Homer Perkins in?" Well, why do they want to know, folks? They want to get to them. (emphasis added)

Appellants objected to the statement when it was made. They contend that the prosecutor's statement was prejudicial insofar as it implied that the defendants and their attorneys were threatening (or would threaten) physical harm to the government's witnesses. This does appear to be the clear import of the diatribe, and for that reason, we believe it was improper. However, we find that in light of the strong evidence against the appellants, there was no substantial prejudicial effect.

## CONCLUSION

The appellants' convictions and sentences are AFFIRMED. Appellants' claims of ineffective assistance of counsel are dismissed without prejudice to their being raised in a habeas corpus proceeding.