**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**

**v.**

**VINCENT GEORGES, JR, and MEADE LAWRENCE, Defendants**

Crim. Nos. 239/94 & 241/94

Territorial Court of the Virgin Islands

Div. of St. Thomas and St. John

March 30, 1998

ANGELA GARNER, ESQ., (Assistant Attorney General), St. Thomas, U.S.V.I, *for Plaintiff*

VINCENT FRAZER, ESQ., St. Thomas, U.S.V.I., *for Defendant Lawrence*

GEORGE HODGE, JR., ESQ., St. Thomas, U.S.V.I., *for Defendant Georges*

SWAN, *Judge*

## MEMORANDUM OPINION

### FACTUAL BACKGROUND AND PROCEDURAL POSTURE

On April 2nd, 1996, a jury found both Defendants "Guilty" of First Degree Robbery, (14 V.I.C. § 1862 (2)), Unauthorized Possession of a Firearm, (14 V.I.C. § 2253), and Unlawful Possession of Stolen Property (14 V.I.C. § 2101). Approximately two weeks later, the Court received a letter from one of the jurors, Gemma L. Crabbe-Whyte, ("Crabbe-Whyte") in which she alleged certain misconduct by members of the jury. Essentially, she alleged that jurors had considered improper factors in arriving at their verdict. The Court gave a copy of the letter to the attorneys in the case. Based upon the allegations in Crabbe-Whyte's letter, Defense Attorneys promptly filed motions for a new trial. The Court reviewed the letter and concluded that because of the nature of the allegations, and pursuant to FED. R. EVID. 606(b),[1] the Court was precluded from investigating Crabbe-Whyte's allegations.

Defendants perfected a timely appeal of their convictions, raising as one of the issues the Court's denial of their motions for a new trial.

In a November 18, 1997 Order, the Appellate Division of the District Court reversed this Court's decision on the RULE 606(b) ruling, and remanded the cases, instructing that a hearing or investigation be conducted on Crabbe-Whyte's allegations.

### ISSUE

Whether extraneous prejudicial information was improperly brought to the jurors' attention or was discussed by them, before or during deliberation, which did or could have adversely influenced the jurors' deliberation or could have contaminated the jury's guilty verdicts.

---

[1] 606 "(b) Inquiry Into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberation or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any settlement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes."

147

## DISCUSSION

Essentially, approximately two weeks after the jury's verdicts one juror, Gemma L. Crabbe-Whyte, ("Crabbe-Whyte") wrote this Court a confidential, type written, two page, notarized letter dated April 17, 1996, expressing her reservation of having voted to convict the defendants.[2] Crabbe-Whyte also importuned the Court to be lenient when sentencing the defendants, because of some jurors' conduct which she believed influenced or contaminated the

---

[2] April 17, 1996
Gemma L. Crabbe-Whyte
P.O. Box 307662
St. Thomas, V.I. 00803-7662

The Honorable Judge
Ive A. Swan
Territorial Court of the Virgin Islands
St. Thomas, VI 00802

Dear Judge Swan;

I was a juror on the case of the Government of the Virgin Islands vs. Meade Lawrence and Vincent Georges, Jr. I'm writing you to voice my concerns on the case.

During deliberations it was quite apparent that several jurors has (sic) preconceived conceptions about the defendants and the case. I feel the jurors ability to reach a fair verdict was clouded by those conceptions.

In my mind, I felt there was several doubts in the Government's case. I tried to get this point across to my fellow jurors, but they were too preoccupied with other issues that should not have been any concern to us. For example, they wanted to know why did Vincent George, Jr. shoot after Meade Lawrence and his family if they weren't guilty of said crime. They also made a reference to the fact that the two defendant's (sic) family (sic) weren't sitting together during the trial. This apparently indicated to them that the two families were feuding because of the case. Several jurors even mentioned that one of the defendants acted and looked like he didn't care or went as far as assuming what witnesses may have said to questions which drew objections. The jurors didn't use just the evidence in this case to convict the defendants.

As it was twelve of us and I was just about the only one to see this ·effect and with all the friction, I felt compelled to agree with the majority. My conscience is not at ease with this decision because I don't feel the Government has sufficient evidence for us to convict the defendants. This decision may cost two young men several years of their lives and myself, a guilt trip for the rest of my life.

I read about the defendants appealing their convictions and felt this was the best time for me to come forward with my concerns. I ask that you take my letter into consideration when considering the appeals.

Sincerely,

Gemma L. Crabbe-Whyte
Juror

jury's verdicts. Crabbe-Whyte made the following pertinent allegations; to wit:

1. That "[t]hey (the jurors) wanted to know why did Vincent George, Jr. shoot after Meade Lawrence and his family if they weren't guilty of said crime."

2. That "[t]hey (the jurors) also made a reference to the fact that the two defendant's (sic) family (sic) weren't sitting together indicated that the two families were feuding because of the case."

3. That "[s]everal jurors even mentioned that one of the defendants acted and looked like he didn't care or had no remorse for committing the crime."

4. That "[t]hey (the jurors) even went as far as assuming what witnesses may have said to questions which drew objections."

At the hearing, Crabbe-Whyte testified under oath that she never discussed her letter or its content with the attorneys in the case nor with the defendants or the defendants' relatives and friends. She further asserted that other than her husband, she never discussed her writing the letter or the subject matters in her letter with anyone. Crabbe-Whyte also testified that she wrote the letter without any input or assistance from anyone. She further testified that she personally typed the letter at her workplace and that the letter was never reviewed nor proofread by anyone. Crabbe-Whyte conveyed the impression that only her husband knew about the letter and its general content. Her husband, however, was a detached listener and offered no opinion on the matters enumerated in her letter. Therefore, the letter was based upon her observations, was of her own volition and was solely undertaken by her, devoid of any influence from her husband.

On December 29, 1997, the Court held a hearing at which some jurors testified under oath.[3] The jurors were Crabbe-Whyte, ten of the twelve jurors who decided the cases, and one alternate juror. Each juror was examined individually by the Court while the other jurors were sequestered in the jury room of another courtroom. The Defendants were present at all hearings. The parties' attorneys

---

[3] Because of the anticipated length of the trial, three alternate jurors, instead of the usual two alternate jurors, were empaneled.

were afforded the opportunity to cross-examine each juror, which they exercised. On January 2, 1998, the final juror of the twelve testified. Similarly, the remaining two (2) alternative jurors testified on January 9, 1998.

■ While the hearings were closed to the public, the records or transcripts of these hearings were not sealed; therefore, public access to the record was uninhibited. This procedure allowed the jurors to be forthright and candid in their testimony, as well as to be at ease in testifying concerning allegations which attempted to impugn their integrity. It is noteworthy that a contingent of the defendants' family members and friends were in attendance for the hearings. Both the Government's and Defendant Georges' Attorneys had no objection to closure of all hearings. Defendant Lawrence's Attorney registered an objection to the hearings being closed. It is noteworthy that in *United States v. Di Salvo*, 34 F.3d 1204, 1223 (3d Cir. 1994) the Court held that it was not reversible error for the trial judge to conduct an *in camera* voir dire to determine jury exposure to trial publicity, because the jurors testified under oath and in the presence of both the defense and the prosecutor.

The Court will individually address the issues engendered by Crabbe-Whyte's allegations, both before jury deliberation and during jury deliberation when the jurors were together.

## I. Crabbe-Whyte's Allegation that Jurors Wanted to Know Why Defendant Vincent Georges Shot At Defendant Meade Lawrence or At Meade's Family Members

Crabbe-Whyte asserted in her sworn testimony that the subject of Defendant Vincent Georges, Jr. ("Georges") shooting at Defendant Meade Lawrence ("Lawrence") or discharging a firearm at him was discussed once by the jurors, in casual conversation, for a few minutes in which "everyone talked about it." She further asserted that the conversation lasted approximately two to three minutes, and the discussion occurred before jury deliberation. The conversation concerned a news article in The Daily News Newspaper which alleged that Georges had discharged a firearm at Lawrence during the time between the Defendants' arraignments and their joint trial, while both were released on bail.

However, Crabbe-Whyte averment is overwhelmingly contradicted by the other jurors. Of the eleven (11) other jurors, eight (8) said the subject of Georges shooting at Lawrence or Lawrence's family members was never discussed either before or during jury deliberation. The other three (3) jurors said they did not remember the subject being mentioned or discussed either before or during jury deliberation. All three (3) alternate jurors testified that the subject was never discussed. Importantly, three (3) jurors, Samuel Edwards, Erica Benjamin-Henry, Ester Rose Benjamin and one (1) alternate juror, Lisa Hood, testified that the first time they heard anything about the alleged shooting incident was after the verdict and when the jury had been discharged from the case. Juror Samuel Edwards and Alternate Juror Lisa Hood further contended that the first time they heard about any shooting involving the defendants were when they were being questioned by the Court during the hearing. All four (4) jurors volunteered their statements during their responses to specific questions.

It is noteworthy that Crabbe-Whyte indicated at the voir dire proceeding that she had read news articles pertaining to the alleged shooting.[4]

Accordingly, why Crabbe-Whyte recalled certain extraneous matters being discussed, while others who were present in the same room with her and who were part of the same group, contend that they never discussed or can not recall discussing any such matters is perplexing to the Court. The evidence contradicting Crabbe-Whyte's assertion is irrefutable. Similarly, the evidence from the hearings is totally devoid of any corroboration of either Crabbe-Whyte's testimony or her written allegations. The Court concludes, therefore, that no discussion ever occurred before or during jury deliberation, concerning Georges shooting at or discharging a firearm at Lawrence or at Lawrence's family members.

## II. Crabbe-Whyte's Allegation that The Defendants' Families Not Sitting Together During the Trial

In her testimony, Crabbe-Whyte contended that before jury deliberation, a discussion ensued for one to two minutes, concern-

---

[4] See page four of the November 18, 1997 Order of the Appellate Division of the District Court remanding this case.

ing the defendants' families not sitting together. She further stated that the discussion involved about half of the jurors, and the subject was discussed on the same day that the shooting incident was discussed by the jurors.

However, nine (9) jurors testified that no such discussion ever occurred. Two (2) other jurors do not recall the subject being discussed. They unequivocally denied Crabbe-Whyte's assertion on this subject. Similarly, all three (3) alternate jurors denied that the subject of the Defendants' families not sitting together was ever discussed. The Court finds befuddling and confounding how fifteen (15) persons could be in a closed room, and one of the fifteen (15) persons could recall a subject being discussed for one to two minutes, but not one of the other fourteen (14) persons can recall the same subject ever being discussed or mentioned.

Significantly, the above two allegations by Crabbe-Whyte are not instances of subjects being discussed with others, and there is disagreement as to the level or length of the discussions. Likewise, these are not instances in which subjects are discussed and someone endeavored to exaggerate or embellish what were discussed. To the contrary, these are instances in which alleged participants in the discussion unfailingly denied or can not recall any discussion whatsoever on the subjects that Crabbe-Whyte asserted were discussed.

Obviously, this scenario is most disconcerting, because on the one hand a single juror asserted, under oath, that subjects were discussed and on the other hand, fourteen (14) jurors stated, under oath, that they can not recall any discussion or no such discussion occurred. These two incidents educe the specter of perjury.

### III. Crabbe-Whyte's Allegation that Jurors Discussed the Defendants Not Showing Remorse

Crabbe-Whyte complained that jurors discussed the fact that one of the defendants "looked like he didn't care or had no remorse for committing the crime." The implication of this assertion is extremely ominous. Undeniably, her statement suggests that the jurors had already prejudged the case and the defendants' guilt. Significantly, she used the term "remorse" which is associated with or coterminous with guilt.

152

Ten (10) of the eleven (11) other jurors stated that no discussion occurred nor were comments made either before or during jury deliberation. One (1) other juror could not recall the subject being discussed. The unavoidable conclusion is that the eleven other jurors' testimony unmistakably contradicted Crabbe-Whyte's statements in both her letter and her testimony. Interestingly, Crabbe-Whyte used the word "remorse." Yet, two (2) jurors recalled that the word "remorse" was never mentioned before or during jury deliberation.

However, five (5) jurors testified that brief comments were made by some jurors, as an observation, concerning the nonchalance or indifferent attitude of one defendant and his apparent disinterestedness in the trial. One defendant had reposed his head on counsel's table during the trial. One juror regarded that conduct as some disrespect towards the Court. Another juror expressed sympathy for Lawrence during a recess in the trial.

To reiterate, the comments were made as observations and not as a discussion on the merits of the case. All jurors who recalled the comments on one defendant's disinterestedness in the trial, recalled them as observations as to the unusual behavior of that Defendant believed to be Georges. Nonetheless, the eleven (11) jurors are adamant that the jurors' comments were tantamount to fortuitous observations and definitely not as discussions concerning the Defendants' guilt or innocence.

The Court finds that the discussions did not concern whether the Defendants committed the crimes, nor concern the defendants not evincing remorse in connection with the crimes. But, the Court does find that some jurors made 'passing' or 'transient' remarks about Defendant Georges' unusual behavior or about his demonstrated lack of interest in his trial. Importantly, fourteen (14) jurors unequivocally asserted that there was no discussion on the merits of the case prior to jury deliberation.

Admittedly, Crabbe-Whyte apparently heard other jurors' comments about Georges' peculiar or unusual antics of appearing disinterested in his trial. Nonetheless, the Court finds that Crabbe-Whyte's assertion of "no remorse for the crimes" was fallacious. The Court further finds that she vastly over-exaggerated the subject of the jurors' comments and the context in which they were said.

## IV. Crabbe-Whyte's Allegation of Jurors Assuming What Witnesses Would Have Said After The Court had Something Stricken from the Record or Sustained an Objection to a Question

Crabbe-Whyte averred that the jurors considered matters that the Court either had stricken from the record or to which the Court sustained an objection. Specifically, Crabbe-Whyte alleged that the jurors speculated as to what witnesses would have said had they been permitted to respond to questions to which the Court had sustained objections.

Ten (10) jurors and two (2) alternate jurors said the issues were never discussed either before or during jury deliberation. One (1) other juror and one (1) alternate juror did not recall the subjects being discussed. Two (2) jurors remembered that a juror made a comment about something, concerning a matter the Court had stricken from the record. However, the juror was immediately reminded by another juror, believed to be the chairperson, that the Court had stricken the matter from the record; therefore, the matter could not be discussed. The admonition immediately ended the subject. The consensus emanating from the jurors' testimony was that if anyone had mentioned anything to which the Court had sustained an objection or which the Court had stricken from the record, he or she was immediately rebuked or reminded that the Court had either stricken the matter or had sustained an objection to the matter. Therefore, no discussion could be had on the subject.

This case is not one in which two or three jurors confirm Crabbe-Whyte's claims. Rather, this case involves no modicum or scintilla of evidence supporting the substance of Crabbe-Whyte's claims.

The Court further finds that there is an excruciating absence of corroboration, or at best peripheral corroboration on only one of Crabbe-Whyte's claims. But, the corroboration concerns something being said; however, whatever was said does not implicate jury misconduct. Significantly, the jurors' remarks were not remotely close to what Crabbe-Whyte asserted were discussed. Additionally, the Court finds that Crabbe-Whyte, for whatever inexplicable reason, is mendacious in her allegations.

This Court concludes that Crabbe-Whyte's allegations involve a malicious and calculated attempt to belatedly subvert a valid jury

verdict, which is supported by the evidence in the case. The evidence in the case included the testimony of another co-defendant who turned state evidence.

The established facts lead to the compelling and inescapable conclusion that there was no extraneous prejudicial information impacting the jury's verdicts in this case and no prejudicial extraneous influence on the jury either before or during jury deliberation. Similarly, the evidence is overwhelming in contradicting Crabbe-Whyte's claim of jury misconduct.

■ Importantly, Federal Appellate Courts have afforded great deference to trial courts' findings of no prejudice to defendants in cases in which much more exposure to extraneous matters, with possible prejudice, have occurred than in this case. For example, in *United States v. McDonough*, 56 F.3d 381, 386 (2d Cir. 1995), the trial court's findings that the defendant was not prejudiced was given deference despite a juror's contact with a newspaper article concerning the trial. Further, in *McDough*, two jurors had seen but not read the article, a third juror had only read enough of the article to determine that it concerned the case, and other jurors only knew that the article existed. Similarly, in *United States v. Elder*, 90 F.3d 1110, 1130-31 (6th Cir.) *cert. denied*, 117 S.Ct. 529 (1996), the trial court's finding that the defendant was not prejudiced was given deference, despite the fact that the trial was highly publicized and the exhibit list containing extraneous evidence was accidentally sent into the jury room. In still another case, the trial court's finding that the defendant was not prejudiced was entitled to deference despite the fact that the jury foreperson consulted with an outside attorney concerning substantive issues of law in the case *United States v. Blumeyer*, 62 F.3d 1013, 1016-17 (8th Cir. 1995), *cert. denied*, 116 S. Ct. 1263 (1996).

For this Court to give credence to Crabbe-Whyte's allegations, the Court must find that fourteen jurors conspired to commit perjury. It would be fourteen persons who, except for their serving on the same jury, were virtually strangers to each other. But, these circumstances do not make for a conspiracy.

This Court can find no evidence that would motivate fourteen persons, with no personal stake or financial interest in this case, to

compromise their integrity and veracity concerning what was discussed in the jury room.

Significantly, there has been a case in which, despite prejudicial linkage, a Federal Appellate Court has refused to reverse the convictions. For example, in *United States v. William-Davis*, 90 F.3d 490, 499-502 (D.C. Cir. 1996), the Court held there was no actual prejudice eventhough jurors' affidavits stated that they read and discussed newspaper articles about the trial during deliberation, because the information in the media reports did not influence the jurors' opinion of guilty where information was cumulative and evidence of the defendant's guilt was overwhelming.

■ Crabbe-Whyte suggested that she was pressured into agreeing with the other jurors on the verdict, when she stated in her letter that *"I felt compelled to agree with the majority."* The Court will eschew and disregard this assertion. In *United States v. Strooch*, 987 F.2d 232, 241-42 (5th Cir. 1993), the Court disregarded two jurors' affidavits stating that they believe the convicted defendant was innocent, because such information is not admissible under FED. R. EVID. 606(b). Further, the Court asserted that "pressure" from other jurors is not considered "outside influence" and testimony about the jury's internal deliberation cannot result in a mistrial.

## CONCLUSION

■ Accordingly, the Court concludes that there was no extraneous prejudicial information that was brought to the jurors' attention or discussed by them either before or during jury deliberation. The Court likewise concludes that there is no evidence of jury misconduct or of jurors considering improper or extraneous factors in arriving at their guilty verdicts. The Court further concludes that there is no reasonable possibility that any extraneous prejudicial material could have affected the verdicts in this case.

Lastly, the Court will refer this case to the Attorney General of the Virgin Islands for further investigation to determine whether perjury or other criminal charges should be filed against any member or members of the jury panel.

DATED: March 30, 1998.