**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**January 5, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 05-30324

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EDUARDO TORRES,

Defendant-Appellant.

.......................................................................

No. 05-30326

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LESLIE "BEAU" KIMES,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Louisiana

Before GARWOOD, DENNIS, and OWEN, Circuit Judges.

PER CURIAM:*

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except

Defendants Eduardo "Eddie" Torres (Torres) and Leslie "Beau" Kimes (Kimes) were each found guilty of conspiracy to possess with intent to distribute fifty grams or more of methamphetamine and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Kimes was also found guilty of two additional charges: attempt to possess with intent to distribute five grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and possession with intent to distribute methamphetamine in violation of 21 U.S.C § 841(a)(1) and 18 U.S.C. § 2. Torres was subsequently sentenced to 168 months of imprisonment and Kimes was sentenced to ninety-seven months of imprisonment. Torres does not challenge his conviction but does challenge his sentence, arguing that he was incorrectly held responsible for twelve pounds of methamphetamine based on the unreliable and uncorroborated testimony of a co-conspirator. Kimes challenges the sufficiency of evidence supporting his convictions. Finding no reversible error, we affirm as to both Kimes and Torres.

BACKGROUND FACTS AND PROCEEDINGS

In July 2003, John Auger, II (Auger) began cooperating with FBI special agent Greg Adams (Adams) and the FBI Metro Safe

under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

2

Streets Task Force (FBI), which was investigating a methamphetamine ring in Union Parish and northeast Louisiana. As part of his cooperation, Auger made consensually monitored telephone calls to and provided information regarding the other members of the methamphetamine distribution conspiracy. During this time, Auger also arranged for his supplier, Torres, to continue to sell him methamphetamine and ship it to him in Louisiana. Initially, Matt Zancanilla, Quinn Campbell, and Wes Goodrich—each of whom obtained their methamphetamine from Torres—supplied Auger with methamphetamine, but in late 2002 they put Auger directly in touch with Torres. At all times, Torres, who resided in Madera, California, was the ultimate supplier of the methamphetamine Auger distributed. Auger testified that each purchase from Torres was in a one-pound amount and cost $6,500 a pound.

Upon receipt of his order from Torres, Auger would then front portions of those one-pound shipments among the co-conspirators Jason Murray, Neal Pace, and Kimes. Murray would then send to Torres via FedEx the money owed to him. During this period of cooperation, Auger double-crossed the FBI twice by having Torres ship drugs to him surreptitiously at different addresses—successfully in July 2003 and unsuccessfully on August 15, 2003 when the FBI intercepted the package. Each package contained the usual one-pound amount of methamphetamine. Auger

3

was arrested when his betrayal was discovered but continued to cooperate with investigators with the incentive of potential leniency at sentencing.

In the course of the taped phone calls, the conspirators informed Auger of the amounts of drugs they wanted to purchase from him and arranged a meeting place and time. All except Torres were arrested when they arrived at their scheduled August 15, 2003 meeting. Law enforcement agents arrested Torres when they searched his home in August 2003 and found 434.55 grams of methamphetamine, FedEx labels, an envelope, a scale, and a firearm. Torres "admitted [to agents] he 'messed up' and distributed methamphetamine." On September 10, 2003, a federal grand jury indicted Kimes,[1] Torres,[2] and three other named

_____

[1]Kimes was ultimately found guilty of Counts One, Five, and Seven in the indictment, which he now appeals:
"COUNT 1 (CONSPIRACY)
    Beginning in the summer of 2001 and continuing through August 21, 2003, the exact dates being uncertain, in the Western District of Louisiana, and elsewhere, the defendants, [Torres, Kimes, and others] did knowingly and intentionally conspire and agree together to possess with intent to distribute 50 grams or more of methamphetamine and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, all in violation of Title 21, United States Code, Sections 841(a)(1) and 846. . . .

COUNT 5 (ATTEMPT TO POSSESS WITH INTENT TO DISTRIBUTE)
    On or about August 16, 2003, in the Western District of Louisiana, the defendant, BEAU KIMES, knowingly attempted to possess with intent to distribute 5 grams or more of methamphetamine and 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II

4

defendants.

The first trial resulted in a mistrial and the second trial ended on June 14, 2004.  The jury in the second trial found Torres guilty of conspiracy to distribute fifty grams or more of methamphetamine and 500 grams or more of a mixture containing methamphetamine, but found him not guilty of possession of a firearm in furtherance of a drug trafficking crime.  Kimes was found guilty of all three counts with which he was charged and

controlled substance, all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2. . . .

COUNT 7 (POSSESSION WITH INTENT TO DISTRIBUTE)
      On or about August 16, 2003, in the Western District of Louisiana, the defendant, BEAU KIMES, knowingly possessed with intent to distribute methamphetamine, a Schedule II controlled substance, all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2."  Kimes Rec. Excerpts, Tab 2.

[2]Torres was ultimately found guilty of Count One in his superseding indictment:
    "COUNT 1 (CONSPIRACY)
      Beginning in the summer of 2001 and continuing through August 21, 2003, the exact dates being uncertain, in the Western District of Louisiana, and elsewhere, the defendant, EDUARDO TORRES, and other persons both known and unknown to the grand jury, did knowingly and intentionally conspire and agree together to possess with intent to distribute 50 grams or more of methamphetamine or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, all in violation of Title 21, United States Code, Sections 841(a)(1) and 846." Torres Rec. Excerpts, Tab 3.

5

received a sentence of ninety-seven months' imprisonment on each of his three convictions at his March 8, 2005 sentencing hearing.

At Torres's sentencing hearing on March 7, 2005, the district judge heard the testimony of defense witness Rogerio Garza (Garza) in addition to argument from defense counsel and from the government. Garza testified as to conversations he had with Auger while the two were cellmates for two months at the Union Parish Detention Center from April to June of 2004. Garza testified that Auger confessed to him that Wes Goodrich was his source of methamphetamine and he only received the single intercepted package from Torres. According to Garza, Auger said "he was going to 'blame the guys that they already had' and he was 'going to lie' because 'all he wanted was to just go home.'" The district court determined that there was sufficient creditable evidence to support the conclusion that over the course of the conspiracy Torres shipped at least twelve pounds of methamphetamine to Auger to distribute in Louisiana and that Garza's testimony did not persuade him otherwise.[3] Therefore,

---

[3]The court stated in part in this connection:
". . . Defendant suggests through Garza that Auger had a motive to attribute his purchases of methamphetamine to the defendant rather than to his friend, Wes Goodrich.
     However, by attributing these amounts to the defendant, Auger, Auger implicated himself in the relevant conduct and increased his own potential sentence as a result. If, as he allegedly told Garza, he was willing to lie in order to avoid a prison sentence, he certainly had no motive to attribute amounts of methamphetamine to defendant that would only

the resulting guidelines sentencing range was 168 to 210 months, and the district court sentenced Torres to 168 months.

Kimes appeals his convictions on counts 1 (conspiracy) and 7 (possession with intent to distribute), but not his conviction on count 5 (attempted possession with intent to distribute).  Torres appeals his sentence.

DISCUSSION

**I. Sufficiency of the Evidence to Support Kimes' Convictions**

Kimes challenges the sufficiency of the evidence to support two of his convictions.  We review the evidence presented and all reasonable inferences therefrom in the light most favorable to the prosecution to determine whether a rational jury could have found the essential elements of the offenses beyond a reasonable doubt.  *Jackson v. Virginia*, 99 S.Ct. 2781 (1979); *United States v. Brugman,* 364 F.3d 613, 615 (5th Cir. 2004); *United States v.*

---

serve to increase his own prison sentence.

Further, the Court had the opportunity to hear Auger's testimony at trial as well as that of co-defendant Murray.  Nothing contained in the presentence report and presented as evidence at trial was contradicted by the testimony of Garza.  While he suggested Auger might have purchased more methamphetamine from Wes Goodrich than he did from defendant, defendant was not shown – has not shown a sufficient basis to find the witness's testimony unreliable, untrue, or inaccurate as to the amounts that were attributed to the defendant.

After considering the evidence presented at trial, the testimony of Rogerio Garza and the argument of counsel, the Court concludes that the defendant is appropriately attributed with 12 pounds of methamphetamine."

7

*Garcia*, 86 F.3d 394, 398 (5th Cir. 1996).  The jury is free to choose among reasonable interpretations of evidence, and the evidence need not exclude all possibility of innocence.  *United States v. Perrien*, 274 F.3d 936, 939–40 (5th Cir. 2001).  We accept all reasonable inferences and credibility determinations that support the jury's verdict.  *United States v. Gonzales*, 866 F.2d 781, 783 (5th Cir. 1989).  The jury's credibility choices are not to be disturbed absent a showing that the testimony relates to facts the witness could not have observed or to events which could not have possibly occurred. *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994).

## A. Count One: Conspiracy

To convict Kimes of conspiracy to distribute methamphetamine, the government must prove that Kimes: (1) had an agreement with at least one other person to violate the narcotics laws; (2) knew of the existence of the conspiracy and intended to join it; and (3) voluntarily participated in the conspiracy. *United States v. Rena*, 981 F.2d 765, 771 (5th Cir. 1993); 21 U.S.C. §§ 841(a)(1)[4] and 846.[5]  The government may prove the

---

[4]21 U.S.C. § 841(a) (2002) provides:
"(a) Unlawful acts
Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally--
(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or
(2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit

8

existence of the conspiracy by circumstantial evidence alone. *United States v. Paul*, 142 F.3d 836, 840 (5th Cir. 1998). And, we have upheld a conspiracy conviction that was based on the uncorroborated testimony of a co-conspirator cooperating with the government in exchange for leniency. *United States v. Medina*, 161 F.3d 867, 872-73 (5th Cir. 1998). "An express agreement is not required; a tacit, mutual agreement with common purpose, design, and understanding will suffice." *United States v. Infante*, 404 F.3d 376, 385 (5th Cir. 2005).

Kimes argues that the government failed to produce sufficient evidence showing he was involved in a conspiracy to distribute methamphetamine. Kimes contends that the evidence merely indicates he was a buyer in several, unrelated transactions and lacked any intent to distribute methamphetamine. Indeed, evidence of no more than only a buyer-seller relationship does not of itself provide sufficient support for a conspiracy conviction. *United States v. Casel*, 995 F.2d 1299, 1306 (5th Cir.1993). However, evidence indicating both parties to the sale knew that the drugs were meant for resale may suffice to

---

substance."

[5] 21 U.S.C. § 846 provides:
"Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

establish a distribution conspiracy between the parties. *Id.*

Viewed in the light most favorable to the verdict, the evidence presented at the trial supports a finding that Kimes knowingly entered into an agreement with Auger to take possession of a large amount of methamphetamine with the intent to distribute it.  First, at the time of his arrest, Kimes was in possession of drug paraphernalia indicative of intended distribution including baggies and a sizeable amount of methamphetamine as well as a police scanner.  Second, the government put in evidence at trial taped conversations between Auger and Kimes that contained references to Kimes' plans to distribute the drugs.  Agent Adams testified that in one of the taped conversation between Auger and Kimes, Kimes had said that an individual was present and wanting to buy a half gram of methamphetamine.  Moreover, the agreed upon amount of methamphetamine Kimes had negotiated to buy from Auger at the August 2003 meeting was one-half pound, which Adams testified is not commonly associated with personal use but with distribution.

As further evidence of a conspiratorial relationship, Auger fronted drugs to Kimes, "which indicates an ongoing relationship of mutual trust and cooperation between these individuals rather than a one-time buyer-seller transaction." *United States v. Santos*, No. 05-20177, 2006 WL 3028096, at *4 (5th Cir. Oct. 25, 2006) (citing *United States v. Posada-Rios*, 158 F.3d 832, 860

10

(5th Cir. 1998) (reasoning that drugs purchased on consignment serves as strong evidence of membership in a conspiracy because it demonstrates a strong level of trust and a mutually dependent relationship)).  Auger testified that he normally fronted four or six ounces at a time to Kimes, identified the individuals to whom Kimes was selling methamphetamine, and testified he had no doubt Kimes was distributing.  Finally, the large amounts of methamphetamine involved (at least twelve pounds) could, under these circumstances, indicate that all parties involved knew that the methamphetamine was intended for distribution.

We hold the evidence is sufficient to support the jury's verdict on the conspiracy count.

## B. Count Seven: Possession with Intent to Distribute

Kimes concedes that he possessed 3.69 grams of methamphetamine at the time of his arrest but argues that the evidence is insufficient to support the jury's verdict finding the required element of intent to distribute.  Kimes argues that even if the evidence is sufficient to show he intended to distribute the larger amounts for which he was found guilty in the conspiracy charge, the evidence is insufficient to show he intended to distribute the smaller amount he possessed at the time of his arrest.  Rather, he asserts the evidence could only show he intended it for personal use.

To convict Kimes of methamphetamine possession with intent

11

to distribute, the government must prove that Kimes knowingly possessed the drug and intended to distribute it. *Infante*, 404 F.3d at 385; 21 U.S.C. § 841(a)(1). An aider and abettor is punishable as a principal. 18 U.S.C. § 2. Distribution intent may be inferred from an amount of drugs present inconsistent with personal use or the presence of paraphernalia indicative of distribution. *See United States v. Lucien*, 61 F.3d 366 at 376 (5th Cir. 1995) (small amount of drugs with large amount of cash, three weapons, and plastic bag with several foil packets held to be sufficient evidence to establish intent to distribute); *United States v. Munoz*, 957 F.2d 171, 174 (5th Cir. 1992) (holding that small quantity of cocaine was sufficient to infer distribution intent when augmented by evidence of distribution paraphernalia or large quantities of cash); *United States v. Pigrum*, 922 F.2d 249, 251 (5th Cir. 1991) (two scales, coffee cup containing test tube, and cutting agent held to be sufficient).

At the time of his arrest, Kimes was in possession of methamphetamine, a pipe, a police scanner, and numerous baggies of the type used to package drugs of this nature for distribution. To support his argument that the drugs were indisputably for his personal use and that an intent to distribute cannot be inferred, Kimes relies primarily on two cases where the small amount of drugs found on the defendant at the time of arrest was legally insufficient to support an

12

inference of intent to distribute. *United States v. Hunt*, 129 F.3d 739, 742, 744 (5th Cir. 1997) (razor blade, small amount of crack, blunts, and gun insufficient to establish distribution intent); *United States v. Skipper*, 74 F.3d 608, 611 (5th Cir. 1996) (presence of razor and noted *absence* of smoking paraphernalia found to be insufficient and observing, "Paraphernalia that could be consistent with personal use does not provide a sound basis for inferring intent to distribute."). Kimes claims that the additional paraphernalia found in his possession with the amount of methamphetamine were consistent with personal use rather than distribution and, therefore, do not support such an inference. Additionally, Kimes points to Auger's testimony at his *sentencing* hearing where Auger testified that he had used drugs with Kimes every time they met and agreed that Kimes had a drug problem. Auger also admitted in that sentencing testimony that he and Kimes had consumed up to a half ounce (fourteen grams) of methamphetamine in a single day.

Kimes has not succeeded in overcoming his heavy burden. First, we cannot consider evidence presented at the sentencing hearing in evaluating the sufficiency of the evidence presented at trial to sustain a conviction. Also, the fact that Kimes was also a user of the drug does not exclude the possibility that the jury may have found he distributed as well. Further, this case is distinguishable from both *Hunt* and *Skipper* due to the presence

13

of the distribution-related paraphernalia in addition to the drugs he possessed at the time of his arrest. In both *Hunt* and *Skipper*, each jury was essentially able to consider only the presence of a razor with a relatively small amount of drugs, which was held not to be a sufficient basis for inferring an intent to distribute. *See Hunt*, 129 F.3d at 741-43; *Skipper*, 74 F.3d at 610-11. Here, in contrast, the jury was also able to consider Auger's testimony in which he named individuals to whom Kimes distributed regularly; Auger's testimony describing the sizeable amounts of methamphetamine Kimes purchased from him; Adams's testimony that these amounts are consistent with distribution and not just personal use; and Kimes's possession at time of arrest of distribution paraphernalia including a police scanner tuned to the local police channel and numerous baggies. Also, Kimes was arrested en route to a meeting where he intended to acquire from Auger up to a half-pound of additional methamphetamine to add to the amount he already possessed.[6]

Viewing the evidence in the light most favorable to the government, we find that a reasonable trier of fact could conclude that Kimes intended to distribute the methamphetamine he possessed at the time of his arrest despite its limited quantity. The evidence as presented at trial is sufficient to sustain

---

[6]This was the basis for Kimes's conviction on the charge of attempted possession with intent to distribute, which he does not appeal.

Kimes's conviction of possession of methamphetamine with intent to distribute.

## II. Determination of Drug Amount for Torres's Sentencing

We review *de novo* the sentence imposed by the district courts under advisement from the United States Sentencing Guidelines (U.S.S.G.), applying a clear error standard of review to claims of erroneous fact-finding regarding the application of adjustments under the guidelines. *United States v. Villanueva*, 408 F.3d 193, 202–03 (5th Cir. 2005); *United States v. Booker*, 125 S.Ct. 738 (2005). A factual finding is not clearly erroneous if it is plausible after reviewing the record as a whole. *United States v. Thomas*, 12 F.3d 1350, 1368 (5th Cir. 1994). Furthermore, to preclude the district court's reliance on information in the PSR that does not facially appear unreliable, the defendant's rebuttal evidence against a PSR's information must normally show that it is materially untrue, inaccurate, or unreliable. *United States v. Taylor*, 227 F.3d 771, 724 (5th Cir. 2001). U.S.S.G. § 6A1.3(a) provides:

> "When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."

15

Torres's PSR concluded that Torres was responsible for at least twelve pounds, or 5.448 kilograms, of methamphetamine based on Auger's statements that he obtained approximately that amount from Torres between May 2002 and August 2003. The resulting base offense level was thirty-six, which was then reduced by two points for acceptance of responsibility. Torres argues that he should not be held responsible for twelve pounds of drugs because Auger was patently unreliable and any corroboration of Auger's testimony yielded only four to five pounds of methamphetamine attributable to Torres, thereby resulting in a base offense level of thirty-four and total offense level of thirty-two.[7] Torres claims he presented sufficient rebuttal evidence that any uncorroborated information from Auger is unreliable, and therefore such testimony should not be considered by the district court because there is insufficient indicia of reliability: (1) it is not disputed that Auger double-crossed the FBI, and therefore lies, and (2) Auger's former cell-mate, Garza, testified as to the unreliability of Auger's testimony.

We are not persuaded. There is nothing in the record to show that the district court was clearly erroneous in finding that Garza's testimony did not demonstrate that less than twelve

---

[7] Torres refers us to the trial testimony of a co-conspirator, Murray, where he testifies he sent a total of $13,000 to Torres for Auger, which supports a finding of two pounds at the established $6,500/pound price, and received three one-pound shipments of methamphetamine from Torres.

16

pounds were involved and that Auger's *testimony* was sufficiently reliable. Also, while Torres objected to certain paragraphs of his PSR, he did not present any evidence to challenge the assertion that he was the ultimate supplier of Auger's previous suppliers, Goodrich and Zancanilla—which further supports the findings of the methamphetamine amounts in the PSR. Indeed, Torres's PSR details specific deliveries of methamphetamine in one-pound quantities between late 2002 and August 2003. Torres's sole argument is that Auger's testimony is incredible. However, the district judge was able to evaluate the credibility of the various witnesses, including Auger, continuously during the two trials and the sentencing hearing, and found that Torres did not uphold his burden to demonstrate that the PSR information was materially untrue, inaccurate, or unreliable. See note 3 *supra*.

There is nothing in the record that warrants vacating Torres's sentence in the face of the clear error standard, and we do not find that the district judge clearly erred in determining Auger's *testimony* to be sufficiently credible to support the PSR's assertions. *See, e.g.*, 18 U.S.C.§ 3742(3) (2003) ("The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and . . . shall give due deference to the district court's application of the guidelines to the facts."); *United States v. Ocana*, 204 F.3d 585, 593 (5th Cir. 2000) ("[Co-conspirators'] inconsistent

17

testimony alone . . . is not enough to demonstrate that this testimony upon which the district court relied is materially untrue.  The inconsistent pattern of their testimony in and of itself does not command that we ignore the district court's appreciation of their testimony as reliable."); *Posada-Rios*, 158 F.3d at 861.  Torres's sentence is affirmed.

CONCLUSION

For the foregoing reasons, we AFFIRM the convictions and sentences of Torres and Kimes.

AFFIRMED.