# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 23, 2010

Lyle W. Cayce
Clerk

No. 09-50724

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

MICHAEL GLYN RAINS; DAVID ALAN ALDRIDGE

Defendants - Appellants

Appeals from the United States District Court
for the Western District of Texas

Before KING, HIGGINBOTHAM, and GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Following a jury trial, Michael Rains and David Aldridge were found guilty of various crimes related to the manufacture and sale of methamphetamine. Rains challenges the sufficiency of the evidence supporting the jury's finding that he was in an agreement to manufacture methamphetamine, the weight involved, and his intent to distribute. Aldridge argues that the district court erred in denying his motion to suppress and in enhancing his sentence under 21 U.S.C. § 841(b)(1)(A) based on a prior conviction under 18 U.S.C. § 924(c).

**I**

Rains and Aldridge were members of a drug ring that manufactured, used, and sold methamphetamine in and around Odessa, Texas. They used a

rudimentary chemical process commonly known as the "red P method" to manufacture methamphetamine. The red P method requires certain precursor chemicals, specifically, phosphorus, iodine, and pseudoephedrine, which can be produced using a variety of household items and legally available products, such as matchbooks, iodine, and over-the-counter decongestants.

In an effort to curb methamphetamine production, the federal government has implemented restrictions on the amount of decongestants containing pseudoephedrine, such as Sudafed, that can be purchased on a daily and monthly basis. *See* 21 U.S.C. § 844(a). Pharmacies keep records of the sale of these decongestants and often require a purchaser to furnish identification and sign a dated receipt. In order to avoid the limits, Aldridge and Rains purchased decongestants at a variety of different pharmacies.[1] Pharmacy records indicated that during the relevant period, Aldridge purchased 121.5 grams of pseudoephedrine and Rains purchased 193 grams. Other conspirators also purchased pseudoephedrine pills and exchanged them with the cookers for drugs or money. Because of the difficulty in acquiring pseudoephedrine, Aldridge and Rains cooked relatively small batches of methamphetamine two to three times a week, usually at Rains's house.

The conspirators also went to some length to acquire iodine. Because many stores that previously sold crystalized iodine had stopped doing so in response to its use in methamphetamine production, the conspirators turned to purchasing concentrated liquid iodine from a veterinary clinic in Andrews, Texas. Although they had to process the liquid iodine in order to use it, the conspirators purchased numerous bottles from the clinic.[2]

---

[1] Apparently, pharmacies often cannot or do not share these records, and individuals are able to exceed the statutory limits by purchasing decongestants from different pharmacies.

[2] The frequent purchases raised the veterinarian's suspicions, causing him to report the purchases to the police. These tips lead to a traffic stop and arrest, during which evidence

No. 09-50724

The conspirators worked together to ready the precursors and cook the methamphetamine. A grand jury indicted several members of the conspiracy in late 2008, and the police executed a series of coordinated arrests. Over the next few months, several of the indicted conspirators pled guilty and agreed to testify against Rains and Aldridge. The grand jury subsequently issued a superceding indictment, charging Rains, Aldridge, two other named persons, and persons known and unknown with conspiring to manufacture in excess of fifty grams of methamphetamine. It further charged both Rains and Aldridge with possession of methamphetamine with the intent to distribute[3] and a variety of counts of purchasing more than nine grams of pseudoephedrine within a thirty-day period.

Aldridge was also charged with possession of methamphetamine and possession of methamphetamine-manufacturing equipment—charges stemming from the traffic stop. Aldridge moved to suppress the evidence from the stop and his subsequent arrest, arguing that the police lacked reasonable suspicion to stop the car. After holding a hearing, the district court denied the motion.

Rains and Aldridge were tried together before a jury. The jury returned a guilty verdict against both men on all counts of the superceding indictment. As discussed below, the district court applied a sentencing enhancement that resulted in a mandatory life sentence for Aldridge.[4] This appeal followed.

## II

### A

Rains challenges the sufficiency of evidence supporting his convictions on three grounds. Specifically, he contends there was insufficient evidence that (1)

---

of methamphetamine production was seized.

[3] The intent-to-distribute counts were not based on the same methamphetamine being possessed by both men. Rather, each count was based on distinct drugs.

[4] Rains does not challenge his sentence on appeal.

3

he was involved in a conspiracy with any of the co-conspirators named in the indictment; (2) the conspiracy involved more than fifty grams of methamphetamine; and (3) he possessed the 15.84 grams with intent to deliver.

When reviewing challenges to the sufficiency of evidence supporting a conviction, we view the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, and determine whether a reasonable jury could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Martinez*, 151 F.3d 384, 388 (5th Cir. 1998). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence." *United States v. Clayton*, 506 F.3d 405, 412 (5th Cir. 2007).

Evidence presented to the jury supports a conclusion that Rains conspired with other named and unnamed co-conspirators.[5] Misty Crow testified that she purchased pseudoephedrine pills for Rains so that he could manufacture methamphetamine. Crow testified that she and others would aggregate their pills for Rains to cook methamphetamine at Rains's house in Odessa, Texas. Rains admitted to police that Crow bought pills for him to manufacture methamphetamine, and that he gave her methamphetamine in return. Crow further testified that Aldridge and Rains manufactured methamphetamine together, usually at Rains's house. Crow explained that Aldridge performed the same tasks as she did, such as crushing pills and cutting up matches, in order to cook methamphetamine at Rains's house. Randi Mutter and Michelle Preston also testified that they gave Rains pills in exchange for money and drugs and

---

[5] Contrary to Rains's argument, the government was not required to prove that Rains was in a conspiracy with any of the co-conspirators named in the indictment. The superceding indictment charges that Rains conspired with named co-conspirators "and with other persons known or unknown." The inclusion of the "other persons" language broadens the conduct beyond the named conspirators. *See United States v. Thomas*, 348 F.3d 78, 83 (5th Cir. 2003).

helped him crush pills and strip match boxes to ready the cooking ingredients. This evidence was sufficient for a reasonable juror to conclude that Rains was involved in a conspiracy to manufacture methamphetamine with Aldridge, who was named in the superceding indictment, and various unnamed other persons. *See United States v. Lewis*, 476 F.3d 369, 386–87 (5th Cir. 2007).[6]

Regarding the weight of drugs involved, the testimony of the state's expert chemist and the records of Rains's pseudoephedrine purchases are sufficient to support the jury's finding that more than fifty grams of methamphetamine were involved. The chemist testified that an average methamphetamine cook could obtain a yield of "somewhere between 45 and 70 percent," or 4.5 to 7 grams of methamphetamine from every 10 grams of pseudoephedrine. Records from various pharmacies established that Rains purchased approximately 193 grams of pseudoephedrine. Even using the low end of the average methamphetamine cook's potential yield and only the pseudoephedrine Rains himself purchased, the jury could reasonably have concluded the conspiracy involved more than fifty

---

[6] At oral argument, Rains's counsel additionally argued that it was improper for the government to prove a two-member conspiracy when the indictment alleged a four-member conspiracy. He contended that because the indictment mentioned certain alleged co-conspirators by name, the government was obligated to provide evidence of their participation. In support of the argument, he cited to *United States v. Miller*, 471 U.S. 130 (1983)*, Russell v. United States*, 369 U.S. 749 (1961), and *Ex Parte Bain*, 121 U.S. 1 (1887). Assuming without deciding that this argument could be raised for the first time at oral argument, we find it unavailing because the evidence presented was within the indictment. *See United States v. Gonzales*, 436 F.3d 560, 577 (5th Cir. 2006) ("[A]n instruction which does not *broaden* the possible bases of conviction beyond what is embraced in the indictment does not constitute a constructive amendment." (emphasis in original)); *United States v. Easter*, No. 05-41352, 2006 WL 1877218, slip op. at 7 (5th Cir. 2006) (per curiam). Although, as noted in *United States v. McGilberry*, 480 F.3d 326, 332 n.5 (5th Cir. 2007), "a constructive amendment complaint might be successful if [the indictment were so broad that] there were reason to believe the defendant lacked notice as to the underlying conduct he was being charged with," here, there is no indication that Rains lacked such notice. *See United States v. Thomas*, 12 F.3d 1350, 1358 (5th Cir. 1998). Accordingly, we find no issue with any discrepancy between the conduct charged in the indictment and the conduct proven at trial.

grams of methamphetamine.[7] Thus, the evidence on weight was sufficient to support the verdict.

There was also sufficient evidence of intent to sell. When Rains was arrested, he had 15.84 grams of methamphetamine in his possession, along with approximately $3,000 cash in a pouch around his neck. The methamphetamine was relatively impure, which a police expert testified was indicative of distribution rather than personal use because a cooker would not dilute the product he was using. *See United States v. Gonzalez*, 339 F. App'x 400, 403 (5th Cir. 2009) (per curiam). Moreover, there was testimony from which the jury could infer that 15.84 grams is much more than a normal amount for daily personal use, thus negating Rains's defense theory. *See United States v. Torres*, 212 F. App'x 361, 366–67 (5th Cir. 2007) (per curiam). Based on the evidence presented, the jury could reasonably conclude Rains possessed the drugs with the intent to sell. *See id.*

In conclusion, we find the evidence sufficient to support Rains's convictions.

**B**

Aldridge argues that an investigatory vehicle stop that led to his arrest and the seizure of several items related to the manufacture of methamphetamine was made without the necessary reasonable suspicion. According to Aldridge, since the stop was illegal, the district court erred in denying his motion to suppress the evidence as fruit of the poisoned stop.

In reviewing the district court's ruling on a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Rangel-Portillo*, 586 F.3d 376, 379 (5th Cir. 2009). The evidence is viewed in the

---

[7] Assuming Rains achieved only a 45% yield, the 193 grams he purchased would produce approximately 87 grams of methamphetamine.

light most favorable to the party that prevailed in the district court. *See United States v. Jordan*, 232 F.3d 447, 448 (5th Cir. 2000). "The reasonableness of an investigatory stop . . . is reviewed de novo." *See United States v. Campbell*, 178 F.3d 345, 348 (5th Cir. 1999) (internal quotation marks and citation omitted).

We analyze the reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity under the framework established in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Stevens*, 487 F.3d 232, 244 (5th Cir. 2007). "Under *Terry*, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." *Id*. (citing *Terry*, 392 U.S. at 19–20). An investigative vehicle stop is permissible under *Terry* when an officer has a reasonable suspicion, supported by articulable facts, that criminal activity may be afoot. *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). A "mere hunch" will not suffice, but a reasonable suspicion does not need to rise to the level of probable cause. *Id*. A tip may provide the reasonable suspicion necessary to justify an investigative stop. *United States v. Martinez*, 486 F.3d 855, 861–62 (5th Cir. 2007).

In this case, prior to the challenged stop, Andrews, Texas police officers had received information from Benjamin Hada, a veterinarian, about an increase in the number of iodine purchases made at his veterinary clinic. Whereas previously he sold between three and six pint-sized bottles of 7% iodine per year, he was selling that many in a month. The police confirmed Dr. Hada's suspicion that the iodine might be used to manufacture methamphetamine, and Dr. Hada's clinic employees thereafter notified police officials when they noticed individuals purchasing large or unusual amounts of iodine.

On the day of the stop, a clinic employee called the Andrews Police Department with information that a female had just purchased three bottles of

iodine from Dr. Hada's clinic. The clinic records indicated that this same woman had purchased eleven bottles of iodine over the prior nine months, and the clinic employee indicated to the police her "numerous" previous purchases. The clinic employee also informed the police that the individual in question listed an address in Odessa, Texas as her residence, meaning that the woman drove from Odessa to Andrews, a rural area approximately thirty-five miles northwest of Odessa, to make these purchases. The clinic employee gave the police the license plate number and a description of the vehicle in which the woman left.

Based on this tip, the police stopped the vehicle, which belonged to Aldridge. Aldridge, the woman who purchased the iodine, and one other person were in the car. During the stop, a police officer noticed a syringe and arrested the occupants for possession of drug paraphernalia. A further search, conducted incident to the arrest, yielded the three pint-sized bottles of iodine purchased from the clinic, plastic tubing, two drug pipes, and receipts for muriatic acid and hydrogen peroxide, which are also used in the manufacture of methamphetamine.

Aldridge's argument is directed at the first *Terry* prong, namely, whether the officer's decision to stop the vehicle was justified at its inception. According to Aldridge, the tip regarding the purchase of iodine, a legal product, is insufficient, at least in this case, to establish reasonable suspicion without some additional investigatory work. Because the officers admittedly had no basis for the stop other than the tip from the veterinary clinic, he concludes that the stop was illegal. He cites to *United States v. Hauser*, 34 F. App'x. 372 (9th Cir. 2002), *United States v. Reinholz*, 245 F.3d 765 (8th Cir. 2001), and *United States v. Araque*, 255 F. Supp. 2d 1010 (D. Neb. 2003), in support of this proposition.

The cases cited by Aldridge do not directly address the issue before the court. In *Araque*, the district court did not hold that facts similar to the instant facts would necessarily run afoul of the Fourth Amendment. Rather, the court

8

said that the tip "*might* not alone have been sufficiently reliable to justify an investigatory stop of the car." 255 F. Supp. 2d at 1012 (emphasis added). *Araque* did not have to reach the question presented here because additional facts supported the stop, namely, the purchase of pseudoephedrine shortly after the aborted attempt to purchase iodine. Likewise, *Reinholz* did not address the issue before us. In that case, the police conducted additional investigation following a tip from a pharmacist about the suspicious purchase of iodine crystals. 245 F.3d at 770–71. The issue, however, was whether the police affidavit misled the judge that issued the search warrant, not the propriety of an investigative vehicle stop. *Id*. at 773. Finally, in *Hauser*, the court mentioned some follow-up investigation, but in no way intimated that all stops relying on tips are necessarily invalid without such investigation. 34 F. App'x. at 372. Thus, we do not find that these cases provide persuasive support to Aldridge.

Aldridge's argument might have more force if the tip had come from a merchant reporting a single purchase of ordinary strength iodine. Here, however, the tippee reported the purchase of three bottles of highly concentrated iodine, following the purchase of numerous such bottles in the prior months. Based on previous discussions between Dr. Hada and the police concerning the typical sale of iodine in the clinic, it was reasonable for the officers to infer that the purchase of such a large quantity in a relatively short period of time indicated that the purchaser intended to use the iodine illegally, that is, for the production of methamphetamine. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) (noting that officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them"). Indeed, as the district court noted, previous tips from the clinic had already resulted in the police shutting down a different methamphetamine manufacturing operation. Moreover, this same

woman had purchased eleven pint sized bottles of concentrated iodine over the prior nine months. We therefore hold that the purchase of the three additional bottles of iodine, when viewed within the "totality of the circumstances," see *United States v. Perkins*, 352 F.3d 198, 199 (5th Cir. 2003), including the ongoing and previously reliable communication between the veterinary clinic and the police, provided reasonable suspicion sufficient to justify the stop. Accordingly, the district court did not err in denying Aldridge's motion to suppress.

## C

The district court gave Aldridge a lifetime mandatory minimum sentence pursuant to 21 U.S.C. § 841(b)(1)(A) because it found that Aldridge had two previous "felony drug offenses."[8] Aldridge acknowledges that he has one such offense but argues that a previous conviction under 18 U.S.C. § 924(c) for possession of a firearm in furtherance of a drug trafficking crime is not a "felony drug offense," and thus cannot serve as the basis for the enhancement.

We review de novo whether a conviction under § 924(c) counts as a felony drug offense for purposes of applying the enhancement under § 841(b)(1)(B). *United States v. Santos-Riviera*, 183 F.3d 367, 369 (5th Cir. 1999). This is an issue of first impression in this circuit, and we approach it with the gravity appropriate to a consideration on which a mandatory life sentence depends.

As in any case involving statutory interpretation, we begin by examining the text of the relevant statutes. *Watt v. Alaska*, 451 U.S. 259, 265 (1981). Section 841(b)(1) does not define "felony drug offense," but the term is defined in 21 U.S.C. § 802(44). "Because the term 'felony drug offense' is specifically defined in § 802(44), and § 841(b)(1) . . . makes use of that precise term, the

---

[8] 21 U.S.C. § 841(b)(1)(A)(viii) provides: "If any person commits a violation of [the subsection criminalizing the manufacture of 50 grams or more of methamphetamine, among other offenses] after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release."

No. 09-50724

logical, commonsense way to interpret 'felony drug offense' in § 841(b)(1) . . . is by reference to the definition in § 802(44)." *United States v. Roberson*, 459 F.3d 39, 52 (1st Cir. 2006). Section 802(44) provides that a "felony drug offense" is:

> an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances.

The law under which Aldridge was punished, § 924(c), provides:

> any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime [be subject to additional penalties for violation of this section].

The issue is whether § 924(c) qualifies as a "law . . . that prohibits or restricts conduct relating to [drugs]."

In the only circuit case addressing this issue, *United States v. Nelson*, 484 F.3d 257 (2007), a panel of the Fourth Circuit split. The majority held that § 924(c) could be the basis for the enhancement, at least when the record made clear the conviction involved a drug trafficking crime rather than a crime of violence. *Id.* at 261. The court reasoned that because Nelson's conduct was not criminal under § 924(c) without his possession of crack with the intent to distribute, the § 924(c) conviction was an offense that prohibited or restricted conduct relating to narcotic drugs under § 802(44). *Id.* The dissent focused on § 802(44)'s use of the word "law," and concluded that an examination of the documents of conviction was inappropriate: a law either does or does not prohibit drug related conduct, and § 924(c), at least in some circumstances, does not. *Id.* at 264–66. Therefore, it could not be the basis of the enhancement. *Id.*

11

The government analogizes the instant case to *United States v. Mankins*, 135 F.3d 946 (5th Cir. 1998), which was cited by both the majority and dissent in *Nelson*.  *See* 484 F.3d at 261, 264 n.1.  In *Mankins*, we held that a conviction under 21 U.S.C. § 843(b) for using a communications facility to facilitate the commission of a drug offense counted as a "felony drug offense" under § 802(44). 135 F.3d at 949–50.  We reasoned that because some drug conduct, either an independent drug crime or the facilitation of such a crime, is an element of a § 843(b) conviction, the statute prohibits drug-related acts, and thus falls within the definition of a"felony drug offense" in that it "prohibits or restricts conduct relating to [unlawful controlled substances]."  *Id*. at 849 (quoting § 802(44)). Although this reasoning supports the government's argument, *Mankins* does not control this case.  Unlike § 924(c), which penalizes some non-drug-related activity, § 843(b) always involves drugs.  Because it is impossible to violate § 843(b) without drug-related activities, *Mankins* does not present a situation in which some violations may constitute felony drug offenses, whereas others may not.  Therefore, it is not entirely applicable to the issue before the court.

We have, however, issued another decision closely analogous to this case. *See United States v. Curry*, 404 F.3d 316 (5th Cir. 2005) (per curiam).  Just as in this case, Curry had received a life sentence under § 841(b)(1)(A) and challenged whether one of his prior convictions should have counted as a "felony drug offense" under § 802(44).  *Id*. at 317.  The disputed conviction was under a Louisiana state law criminalizing the possession of contraband in a state correctional institution.  *Id*. at 318.  Because the underlying state offense reached contraband of any kind, whether it be a weapon or crack cocaine, it was possible to be convicted under the statute without drugs being involved.  *Id*. at 320.  Acknowledging that a conviction for "the general crime of possession of contraband in a penal institution" might not sustain the enhancement, the court nonetheless held that the conviction supported the enhancement because the

No. 09-50724

"state court Bill of Information . . . identified marijuana as the contraband." *Id*. The court cited to *Shepard v. United States*, 544 U.S. 13 (2005), to support its conclusion that "not just the generic crime of possession of contraband [should be] considered . . . , but the underlying facts, proved by the undisputed formal conviction records." *Id*.

Applying *Curry* to the facts of this case, we must conclude that Aldridge's § 924(c) conviction should be considered a felony drug offense under § 802(44). Aldridge does not dispute that the indictment and plea indicate his § 924(c) conviction involved a drug trafficking crime and not a crime of violence. Aldridge was charged with possession of methamphetamine with intent to distribute and possession of a firearm in furtherance of that crime. He pled guilty to the § 924(c) charge, and the predicate drug charge was dismissed. However, since Aldridge could only plead guilty to the § 924(c) charge if he engaged in the predicate drug conduct, he necessarily admitted that his conduct involved possession with intent to distribute methamphetamine. *See Mankins*, 135 F.3d at 949. That is, Aldridge was punished under a law that, at least in this situation, prohibited conduct relating to drugs.

Aldridge argues that even if § 924(c) reaches drug conduct, it should not count as a felony drug offense because it is more appropriately considered a firearms offense than a drug offense. He points to the fact that § 924(c) is in Title 18, whereas the majority of drug laws are found in Title 21. This argument has a certain intuitive force. However, *Curry* establishes that it is permissible to apply the enhancement even when the statute of conviction covers non-drug-related conduct so long as the record makes clear the actual violation involved drugs. 404 F.3d at 320. If the law need not reach drug conduct in its every application, Aldridge's argument loses much of its force. Section 924(c) may more appropriately be considered a firearms statute, but, if so, it is a firearms statute that, at least in some situations, prohibits conducted related to drugs.

13

No. 09-50724

*See United States v. Brown*, 598 F.3d 1013, 1015–16 (8th Cir. 2010) (discussing broad ordinary meaning of the phrase "related to narcotic drugs").

Aldridge also asks us to apply the rule of lenity, which requires courts to construe ambiguous criminal statutes in favor of defendants. *United States v. Granderson*, 511 U.S. 39, 54 (1994). As Aldridge notes, the text of § 802(44) does not specify whether a law that qualifies as a "felony drug offense" must so qualify in its every application. The statute speaks of "any law . . . that prohibits or restricts conduct relating to narcotic drugs." There is no qualification indicating that the law in question must "only restrict," "always restrict," or merely "restrict in part" conduct relating to drugs. Thus, the language of § 802(44) does not necessarily dictate a result when the enhancement depends on a law that may or may not constitute a felony drug offense. *Curry*, however, forecloses application of the rule of lenity based on ambiguity in § 802(44). *See* 404 F.3d at 320 ("The statutory language and structure of § 802(44) are clear. There is no need to resort to lenity.").

In conclusion, we join the Fourth Circuit in holding that § 924(c) can be the basis for an enhancement under § 841(b)(1) when the record makes clear that the conviction involved a drug trafficking crime rather than a crime of violence. *See Nelson*, 484 F.3d at 261.[9]

### III

For the reasons stated, the judgment and sentence of the district court are AFFIRMED.

---

[9] We are concerned that this decision could be read to support a double enhancement when the same underlying conduct gives rise to both a substantive drug offense and a § 924(c) conviction for possession of a firearm in furtherance of a drug trafficking crime. At oral argument, the government indicated it would not pursue a double enhancement under these circumstances. Although we take the government at its word, we also want to be clear that it is not our intention to authorize such a double enhancement.